**COTEAU PROPERTIES COMPANY,**
Appellant,

v.

**DEPARTMENT OF INTERIOR; Bruce Babbitt, Secretary, United States Department of the Interior; Anne Shields, Acting Director, Office of Surface Mining, Reclamation and Enforcement, Appellees.**

**North Dakota Public Service Commission, Amicus Curiae.**

No. 94–1093.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 10, 1994.

Decided May 8, 1995.

5. Plaintiff–Appellees' motion to supplement the record is denied.

Joseph Michael Klise, Washington, DC, argued (John A. Macleod and Thomas C. Means, Washington, DC, Ernest R. Fleck and Charles S. Miller, Jr., Bismarck, ND,

Thomas A. Koza and Andrew S. Good, Dallas, TX on the brief), for appellant.

Karen E. Skelton, Dept. of Justice, Washington, DC, argued (Martin W. Matzen and Stephen G. Bartell, on the brief), for appellee.

Before MAGILL, Circuit Judge, HEANEY, Senior Circuit Judge, and MORRIS SHEPPARD ARNOLD, Circuit Judge.

MAGILL, Circuit Judge.

Coteau Properties Company appeals the district court's denial of its motion for preliminary injunction and consolidated dismissal with prejudice on the merits. In this action for judicial review of a final agency decision by the Office of Surface Mining, Reclamation and Enforcement (OSM), Coteau argues that the final agency decision exceeded OSM's jurisdictional authority and was arbitrary, capricious and not in accordance with law, that the district court erroneously found that it lacked jurisdiction over Coteau's challenge to OSM's jurisdictional authority, and that the district court erroneously found that Coteau suffered no irreparable harm. Because we find that OSM did not follow regulatory mandates in coming to its decision, and because irreparable harm to Coteau resulted, we reverse.

## I. BACKGROUND

The Surface Mining Control and Reclamation Act (SMCRA), 30 U.S.C. §§ 1201–1328 (1986), was enacted by Congress in 1977. SMCRA established a system of regulation for surface mining that divides regulatory power between the federal OSM and state regulatory agencies in states that have achieved "primacy" over in-state surface mining. A state achieves primacy when it obtains OSM approval of a state-designed regulatory program, and once the program is approved, the state assumes "exclusive jurisdiction over the regulation of surface coal mining and reclamation operations." 30 U.S.C. § 1253(a). OSM retains "oversight"

powers in primacy states. *In re Permanent Surface Mining Regulation Litig.*, 653 F.2d 514, 519 (D.C.Cir.1981) (subsequent history omitted) (*PSMRL*).

North Dakota is a primacy state; its state regulatory program is enforced by the North Dakota Public Service Commission (PSC), and the PSC is "the regulatory authority in North Dakota for all surface coal mining and reclamation operations [on non-federal, non-Indian land]." 30 C.F.R. § 934.10 (1989). As the North Dakota regulatory authority, the PSC grants and denies permits to conduct surface coal mining operations on non-federal land following procedures outlined in the OSM-approved state regulatory program. Applicants for permits must, under both North Dakota and federal regulations, give detailed information, including violation histories, regarding any entity that "owns or controls" the applicant. N.D.Admin.Code § 69–05.2–06–01(e), (f); 30 C.F.R. § 778.13, .14 (1989). Under North Dakota and federal regulations, the PSC shall not grant a permit if the applicant is owned or controlled by an entity also owning or controlling a mining operation which is in violation of the North Dakota Surface Mining and Reclamation Law or SMCRA until the applicant submits proof that the violation has been or is in the process of being corrected. N.D.Admin.Code § 69–05.2–10–03; 30 C.F.R. § 773.15(b) (1989).

The events leading to this appeal took place against this statutory background. Coteau Properties Company, a wholly owned subsidiary of the North American Coal Corporation, under permits granted by PSC, engages in surface lignite coal mining and sales at Freedom Mine in western North Dakota, selling approximately fifteen million tons of coal per year. Coteau maintains, through ownership and leasehold, coal reserves of approximately 50,500 acres. 5.7% of the total tonnage of these reserves, private and federal, is leased or subleased from Basin Electric Power Cooperative or Basin's subsidiaries. Under a separate coal requirement contract[1], the Lignite Sales Agree-

---

1. A requirement contract provides that the seller will provide as much of the commodity contracted for as the buyer requires.

Basin is a multi-state generating and transmission facility using mine-mouth or nearly open pit lignite mines to generate electricity. In a gener-

ment, Coteau sells coal to a Basin subsidiary, Dakota Coal Company (DCC). The Agreement requires that Coteau fill DCC's coal requirements; it does not require that this coal come from any particular tract leased or owned by Coteau, nor does it significantly restrict Coteau's right to sell coal to any other buyer, as long as DCC's requirements are met.

On September 2, 1992, prompted by a labor dispute, the United Mine Workers of America (UMWA) filed a "citizen's complaint" with the OSM challenging one of Coteau's mining permits. Coteau is a nonunion operation; Basin is a union operation, and operates under a collective bargaining agreement with the UMWA to which Coteau is not a signatory.[2] The complaint alleged that Basin owns or controls Coteau, and that Coteau failed to include this information in its permit application as required by federal and North Dakota regulations. Under the authority of 30 U.S.C. § 1271(a), on September 9, 1992, OSM responded to the complaint by issuing a ten-day notice to the PSC.[3] On September 16, the PSC informed OSM that Coteau would be given an opportunity to respond to the allegations of ownership or control, and that the PSC would then make a determination as to the validity of the allegations. On November 9, 1992, the PSC determined that Coteau was not owned or controlled by Basin under federal and North Dakota regulations, and issued a Report of Investigation explaining this determination in detail. There was no response from OSM at that time.

On January 13, 1993, the chief of OSM's Applicant/Violator System[4] office (AVS) issued a memorandum opining that Coteau was owned or controlled by Basin. The next day, however, the director of OSM, then Harry M. Snyder, issued a determination that the PSC was correct, and that Coteau was not owned or controlled by Basin. The director's decision was reaffirmed in a memorandum to the Caspar OSM field office on January 19, 1993, stating that the PSC's report "adequately rebutted the presumption of ownership and control between Coteau by [sic] Basin," and that the field office and the AVS office were to "ensure there is no referenced linkage between Basin Electric Cooperative and Coteau Properties Company in the AVS system."

Six days later, immediately following the change in federal executive administrations, the new acting director of OSM, W. Hord Tipton, withdrew the previous director's decision and reopened investigations into a linkage between Coteau and Basin. Tipton issued a final agency decision (FAD) on August 18, 1993, finding that Coteau was owned or controlled by Basin, contrary to the PSC's and Snyder's determinations. The FAD frequently cites the memorandum prepared by the chief of the AVS office (AVS Memo) prior to Snyder's decision that Coteau was not owned or controlled by Basin. In response to a request from Coteau for information regarding the immediate effects of the FAD, the AVS office responded that, although the FAD had "no immediate impact" on Coteau because Coteau was not linked to any outstanding violations at that time, Coteau was immediately obliged to treat Basin as a controlling entity for purposes of permit application. This letter also noted that it had "come

ic sense, it is an electric utility rather than a coal mining operation.

2. The union had brought suit under the Labor Management Relations Act against Basin, DCC, Coteau and North American, alleging breach of collective bargaining agreement, tortious interference with contract, and equitable servitude. The action was dismissed as to Coteau and North American. *International Union, UMWA v. Basin Coop. Servs.*, No. A1–92–114 (D.N.D. Feb. 17, 1993).

3. Under § 1271(a)(1), when the Secretary of the Interior has

reason to believe that any person is in violation of any requirement of this chapter or any per-

mit condition required by this chapter, the Secretary shall notify the State regulatory authority.... If ... the State regulatory authority fails within ten days after notification to take appropriate action to cause said violation to be corrected or to show good cause for such failure and transmit notification of its action to the Secretary, the Secretary shall immediately order Federal inspection of the surface coal mining operation....

4. This is an OSM computerized system identifying violators of surface mining regulations and mining operations linked by ownership or control to violators.

to [AVS's] attention that there may be outstanding violations on one or more of the sites owned or controlled by either [Coteau or Basin]," and that, if so, the FAD would be immediately effective. Were the FAD to be immediately effective, it would block PSC from granting future permits or permit revisions to Coteau until the violations were remedied.

Coteau, rather than pursuing the federal agency review process, sought a preliminary injunction against the enforcement of the FAD in the United States District Court for the District of North Dakota. The district court denied Coteau's motion and dismissed the action on the merits with prejudice, stating that: the court was without jurisdiction to determine the validity of OSM regulations; OSM's FAD was not arbitrary or capricious; the PSC determination was subject to OSM review if the PSC was determining compliance or noncompliance with federal regulations; and Coteau would not suffer an irreparable injury from the FAD, nor was their action likely to succeed on the merits. Mem. and Order at 6–7 (Nov. 23, 1993). Following this decision, the PSC informed Coteau that to complete its pending permit application, Coteau would have to provide detailed information regarding Basin and its subsidiaries. Coteau then filed this appeal.

## II. DISCUSSION

### A. Threshold Issues

#### 1. Jurisdiction

The district court, and this court in turn, have jurisdiction to review the OSM's FAD

under the Administrative Procedure Act, 5 U.S.C. §§ 701–706 (1986), which provides for judicial review of agency action. The district court found that it was "without jurisdiction to pass upon the validity of the regulations of the [OSM], accepting the argument that the District Court of the District of Columbia has exclusive jurisdiction in that area." [5] We do not address the validity of OSM regulations today, and therefore make no ruling on the district court's finding that it did not have jurisdiction to review OSM regulations.[6]

#### 2. Exhaustion and Standing

■ OSM argues two additional threshold issues, both of little merit. First, OSM argues that Coteau was required to exhaust administrative remedies before petitioning for judicial review of the FAD. In *Darby v. Cisneros*, the Supreme Court recently held that only administrative appeals mandated by statute or by agency rule need be pursued before seeking judicial review of an agency decision. —— U.S. ——, ——, 113 S.Ct. 2539, 2545, 125 L.Ed.2d 113 (1993). OSM cites *Southern Ohio Coal Co. v. OSMRE*, 20 F.3d 1418 (6th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 316, 130 L.Ed.2d 278 (1994), in support of its contention that, under SMCRA, administrative review of OSM orders is mandated. *Southern Ohio* is inapplicable to this case, because it concerned OSM enforcement under 30 U.S.C. § 1271(a)(2), for which administrative review is specifically mandated at § 1275. *Id.* at 1421. Section 1275 does not mandate administrative review for enforcement actions brought under § 1271(a)(1), as in this case. *Darby*, there-

---

**5.** The district court presumably based this finding on 30 U.S.C. § 1276(a)(1), which states in part that:

Any action by the Secretary promulgating national rules or regulations including standards pursuant to sections 1251, 1265, 1266, and 1273 of this title shall be subject to judicial review in the United States District Court for the District of Columbia Circuit. Any other action constituting rulemaking by the Secretary shall be subject to judicial review only by the United States District Court for the District in which the surface coal mining operation is located.

**6.** Litigation regarding the constitutional validity of OSM's ownership and control regulations has

been pending in the district court for the District of Columbia since 1988. *See National Wildlife Fed'n, et al. v. Hodel*, No. 88–3117–AER, and consolidated cases.

OSM appears to argue that the district court did dismiss, and should have dismissed, this entire action for lack of jurisdiction. We disagree. The court stated that it lacked jurisdiction to determine the *validity* of OSM regulations, and then proceeded to make specific findings regarding the manner in which OSM *applied* the regulations to Coteau. There is no doubt that the district court had, and exercised, jurisdiction to review OSM's FAD applying regulations to Coteau.

fore, applies, and Coteau need not exhaust optional administrative remedies before seeking judicial review.

■ Second, OSM argues that Coteau does not have standing to contest OSM's reversal of the PSC determination. According to the Department of the Interior itself, this is incorrect. *See Brothers, Inc. v. OSMRE*, 101 IBLA 84 (1988) (holding that a mining operator subject to a federal enforcement action has standing, based on the grounds that the state had taken appropriate action, to challenge OSM's authority to issue a cessation order or notice of violation).

### B. Preliminary Relief

■ In determining whether to grant a preliminary injunction, we consider four factors: (1) the probability that the movant will succeed on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between this harm and the injury that granting the injunction will inflict on other parties or litigants; and (4) the public interest. *Ryko Mfg. Co. v. Eden Servs.*, 759 F.2d 671 (8th Cir.1985) (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir.1981) (en banc)). We review the district court's denial of Coteau's motion for a preliminary injunction for abuse of discretion. *Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 369 (8th Cir.1991).

### 1. Likelihood of Success on the Merits

■ We review the legal conclusion of whether Coteau was likely to succeed on the merits *de novo*. *See City of Las Vegas v. Lujan*, 891 F.2d 927, 932 (D.C.Cir.1989). To arrive at a conclusion regarding the merits of this action, we examine three issues: whether OSM has authority to review the PSC's determination; whether OSM applied the correct standard of review; and, under the correct standard of review, whether OSM's reversal of the PSC's determination was arbitrary and capricious.

### a. OSM's Authority to Review the PSC's Determination

Coteau argues that OSM acted beyond its authority when it effectively reversed the PSC's determination that Coteau was not owned or controlled by Basin. Finding that there exists a state of general confusion regarding SMCRA's allocation of power between OSM and primacy states, we examine the statutory and regulatory structure in some detail.

The district court's entertaining but erroneous memorandum and order characterized Coteau's objections to the OSM's FAD as a tempest in a teapot and as paranoid; the court found, without explanation, that PSC decisions, if determining compliance with national regulations, were reviewable by OSM, and that the OSM's decision was not arbitrary or capricious. These findings are seemingly based on the court's perception of Coteau as suffering no significant harm from the decision, and of the conflict between the PSC and OSM as trivial. We, however, do not perceive the underlying issue of the allocation of regulatory power between federal and state agencies as unimportant. The state primacy system, including the Secretary's corresponding rulemaking and oversight powers, was crafted to ensure that neither flexibility nor environmental safety would be sacrificed. `See PSMRL`, 653 F.2d at 519–21, 525–27. The instant action concerns this tension, and it is our role to protect Congress's determination of the best balance between these competing interests.

Coteau argues that OSM was *ultra vires* in reviewing the PSC's determination regarding ownership and control under § 1271(a)(1) because, under SMCRA and ensuing case law, North Dakota, as a primacy state, has exclusive regulatory jurisdiction over the permitting process, and because Coteau is thus bound only by North Dakota, not federal, regulations. Coteau contends that we need not review the validity of OSM regulations to arrive at this conclusion. We disagree.

Under SMCRA, North Dakota has achieved primacy status by creating a state regulatory program for surface mining operations and obtaining approval of this program from the Secretary of the Interior under 30 U.S.C. § 1253. Primacy status gives the state "exclusive jurisdiction over the regulation of surface coal mining and reclamation operations," § 1253(a), and state, not

federal, regulations govern once a state program is approved by OSM. *See* 30 U.S.C. § 1253(a) (state may assume exclusive jurisdiction over regulation of surface mining); *PSMRL,* 653 F.2d at 519 ("[I]t is with an approved state law and with state regulations consistent with the Secretary's that surface mine operators must comply."); *and Haydo v. Amerikohl Mining, Inc.,* 830 F.2d 494, 497 (3d Cir.1987) (word "exclusive" bears ordinary meaning as used in SMCRA). The Secretary's role in a primacy state becomes "primarily one of oversight." *PSMRL,* 653 F.2d at 519–21, 525–27. There are three statutory exceptions to the state's exclusive jurisdiction, and this appeal concerns the breadth of the powers reserved to the Secretary, and through him the OSM, by § 1271(a).

Section 1271 creates three methods by which the OSM can enforce mining regulations in primacy states.[7] Under the first of these methods, § 1271(a), when the Secretary has reason to believe that a person is in violation of a requirement of SMCRA, he must notify the state regulatory authority. This is known as a ten-day notice, because the state then must within ten days "take appropriate action to cause said violation to be corrected or ... show good cause" why the violation has not been corrected. § 1271(a)(1). If the state fails to take action or show cause within ten days, the Secretary must order a federal inspection of the mining operation suspected of violation. *Id.* If the violation creates an imminent danger to the public's health or safety, or to the environment, the Secretary then can issue a cessation order. § 1271(a)(2). Section 1271(a)(1) is the authority cited by OSM for its ten-day notice, and is the only SMCRA enforcement provision for violations discovered on the basis of information received by the Secretary, rather than on a federal inspection.

■ Coteau's alleged violation of the ownership and control regulations, however, created no imminent danger to health or safety, or to the environment, which is the trigger for federal intervention under § 1271(a)(1) and (2). In addition, Coteau argues that oversight and enforcement authority do not extend to the permitting process. *See PSMRL,* 653 F.2d at 519 ("the state is the sole issuer of permits"), 526 ("individual state permit decisions are unreviewable [by the Secretary]"). Permitting requirements such as revelation of ownership and control links are not likely to be verified through the statutorily-prescribed method of physical federal inspection of the mining operation (and the record in the instant case shows no federal inspection), are unlikely to cause an imminent danger to the public safety or to the environment, and are part of the state program based on state law. Section 1271(a)(1) and (2) then does not provide evident authority for the OSM's intervention in the PSC's permitting decisions regarding Coteau, an operation with no physical violations of any surface mining regulations. The question remains: Under what authority did OSM issue its ten-day notice and then review PSC's determination on the issue of ownership and control? This authority is not to be found in SMCRA itself; we must look to the regulations promulgated under SMCRA.

30 C.F.R. § 842.11(b)(1) (1989) states that:
An authorized representative of the Secretary shall immediately conduct a Federal inspection:

(i) When the authorized representative has reason to believe on the basis of information available to him or her (other than information resulting from a previous Federal inspection) that there exists a violation of the Act, this chapter, the applicable program, or any condition of a permit or an exploration approval, *or* that there exists any condition, practice, or violation which creates an imminent danger to the health or safety of the public or is causing or could reasonable be expected to cause a significant, imminent environmental harm to land, air or water resources, and—

. . . .

(ii)(B)(1) The authorized representative has notified the state regulatory authority of the possible violation and more than ten days have passed since notification and the State regulatory authority has failed to take appropriate action to cause the viola-

7. The second and third methods have not been invoked by OSM in this case.

tion to be corrected or to show good cause for such failure and to inform the authorized representative of its response. After receiving a response from the State regulatory authority, before inspection, the authorized representative shall determine in writing whether the standards for appropriate action or good cause for such failure have been met.

30 C.F.R. § 842.11(b) (emphasis added). 30 C.F.R. § 843.12(a)(2) (1989) states:

When, on . the basis of [a] Federal inspection [as described . in § 842.11(b)(1)(ii)(B)(1)], an authorized representative of the Secretary determines that there exists a violation of the Act, the State program, or any condition of a permit or exploration approval required by the Act which *does not create an imminent danger or harm* ... the authorized representative shall give a written report of the violation to the State and to the permittee so that appropriate action can be taken by the State. Where the State fails within ten days after notification to take appropriate action to cause the violation to be corrected, or to show good cause for such failure ... the authorized representative shall reinspect and, if the violation continues to exist, shall issue a notice of violation or cessation order, as appropriate. No additional notification to the State by the Office is required before the issuance of a notice of violation if previous notification was given under § 842.11(b)(1)(ii)(B) of this chapter.

30 C.F.R. § 843.12(a)(2) (emphasis added).

█ These regulations parallel SMCRA § 1271(a)(1) and (2) closely, with an exception: §§ 842.11 and 843.12 mandate intervention for any condition that is a violation of either state or federal regulations, *or* an imminent danger. Assuming that "federal inspection" includes an investigation of a mining operations' financial affairs, these regulations provide authority for OSM's review of the PSC's permitting decision, whether based on state or on federal regulations,

and whether an imminent danger was presented or not. 30 C.F.R. § 778.13 designates information that must be provided by any surface mining permit applicant to any regulatory authority that will be making the permitting decision. Amongst the information that must be provided are details concerning "each person who owns or controls the applicant under the definition of 'owned or controlled' and 'owns or controls' in § 773.5 of this chapter." 30 C.F.R. § 778.13(c). Sections 842.11 and 843.12 authorize federal intervention, in the form of an inspection followed by a notice of violation, if a mining operation is found to be in violation of a provision of "this chapter." "This chapter" refers to 30 C.F.R. ch. VII, which includes § 778.13(c). It follows that §§ 842.11 and 843.12 authorize ten-day notice to the state regulatory authority, federal inspection, and review of the state authority's decision based on a violation of the ownership and control information requirements set out in § 778.13(c). Thus, under its own regulations, OSM had the authority to review the PSC's determination that Coteau was not owned or controlled by Basin, and Coteau's *ultra vires* argument demands review of the regulations themselves.[8]

We decline to review the constitutionality of these regulations at this stage of proceedings, and for the purpose of examining the likelihood that Coteau will succeed on the merits of its claims that do not challenge the validity of the regulations themselves, we assume, without deciding, that the regulations are valid. Under §§ 842.11 and 843.12 as written, OSM did have authority to issue a ten-day notice to the PSC regarding alleged ownership and control linkage between Coteau and Basin, and, *if the PSC failed to take appropriate action or to show good cause for failure to do so,* OSM had authority to order inspection and, if a violation was found, a notice of violation. OSM therefore had authority to review the PSC's determination to

---

8. The definition of ownership and control included in the North Dakota regulatory program, N.D.Admin.Code § 69–05.2–01–2(64), is, for our purposes, the same as the federal definition of ownership and control, 30 C.F.R. § 773.5. We

need not, therefore, sort out which provision takes priority when there is a substantive conflict between state regulatory provisions approved as part of a state program by OSM and federal regulatory provisions.

find if it provided for appropriate action or showed good cause for failure to do so.

### b. OSM's Review of the PSC's Determination

Treating the enforcement regulations at §§ 842.11 and 842.12 as valid, we proceed to examine OSM's review of the PSC determination that Coteau was not owned or controlled by Basin. It has long been settled that an agency must abide by its own regulations. *Voyageurs Region Nat'l Park Ass'n v. Lujan,* 966 F.2d 424, 428 (8th Cir.1992) (citing *Service v. Dulles,* 354 U.S. 363, 372, 77 S.Ct. 1152, 1157, 1 L.Ed.2d 1403 (1957)). We examine the agency FAD, setting it aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Voyageurs,* 966 F.2d at 427 (quoting 5 U.S.C. § 706(2)(A)). We find that, by applying a *de novo* standard of review to the PSC determination, OSM did not act in accordance with law, and that their reversal of the PSC's determination was arbitrary.

■ OSM argues that we should examine the OSM's FAD for a "patent violation" of the law only, citing *Leedom v. Kyne,* 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958). As appellants note in their brief, *Leedom* carves out a special exception to the general rule that agency decisions are not appealable until final. "[A] Board order in certification proceedings under § 9 is not 'a final order' and therefore is not subject to judicial review...." *Id.* at 187, 79 S.Ct. at 183. The OSM specifically designated its determination of ownership and control as a "final agency decision," and *Leedom* therefore is inapplicable. We review the OSM decision under the standard applicable when Congress has not specifically indicated a limited scope of review. *See Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415–16, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971) (subsequent history omitted) (stating that the standard of review at 5 U.S.C. § 706(2)(A) is generally applicable).

### i. The Standard of Review

Under § 842.11, OSM can order a federal inspection only if the state does not take appropriate action to correct a reported violation or show good cause for failure to correct it. OSM's authority to issue a notice of violation under § 843.12 is triggered by an inspection. Thus, if the state takes appropriate action or shows good cause in response to a ten-day notice, neither federal inspection nor a federal notice of violation is authorized by the regulations.

Section 842.11 provides a standard for appropriate action and good cause:

> [A]n action or response by a State regulatory authority that is not arbitrary, capricious, or an abuse of discretion under the state program shall be considered "appropriate action" to cause a violation to be corrected or "good cause" for failure to do so.

30 C.F.R. § 842.11(b)(1)(ii)(B)(2).

Under the federal regulations, if the PSC determination that Basin does not own or control Coteau was not arbitrary, capricious, or an abuse of discretion, the determination constituted appropriate action regarding the alleged violation, and should have ended the proceedings.

### ii. The PSC Determination

The PSC Report of Investigation concluding that Basin does not own or control Coteau indicates that the PSC conducted a thorough investigation of the relationship between Basin and Coteau, and provides both legal and factual support for the conclusion that, despite the relationship, Basin does not control Coteau's operations. Under both federal and state regulations:

> The following relationships are presumed to constitute ownership or control unless a person can demonstrate that the person subject to the presumption does not in fact have the authority directly or indirectly to determine the manner in which the relevant surface coal mining operation is conducted:
>
> ....
>
> (6) Owning or controlling coal to be mined by another person under a lease, sublease or other contract and having the right to receive such coal after mining or having authority to determine the manner

in which that person or another person conducts a surface coal mining operation. 30 C.F.R. § 773.5(b); *see* N.D.Admin.Code § 69–05.2–01–02(64).

Basin owned coal to be mined, under lease, by Coteau. A subsidiary of Basin, DCC, had a contract with Coteau stating that Coteau would supply all of DCC's coal requirements. The PSC found that this relationship gave rise to a presumption, under § 773.5(b)(6), that Basin controlled Coteau, but found that Coteau had successfully rebutted this presumption, as provided for in the regulation.

The PSC found, first, that the contractual agreements between Coteau and Basin were traditional "arm's length" business contracts. The contracts include several provisions designed to allocate risk between the parties; provisions, such as default remedies for Basin, that would not be necessary if Basin in fact controlled Coteau's mining operation. The Agreement, the contract forming the key § 773.5(b)(6) relationship between Coteau and Basin, provides for: arbitration in the event of a dispute between DCC and Coteau; a "cost plus" arrangement, which allocates the risk of increased production costs, particularly costs of reclamation, to DCC; compliance by Coteau with all surface mining regulatory requirements; payment by Basin of Coteau's out-of-pocket expenses if Basin takes no coal deliveries; an option for Basin to buy Coteau out at the end of the Agreement's term; and a requirement that Basin buy Coteau out if Basin terminates the Agreement, with prices to be determined by an independent auditor. The PSC found that these provisions indicate that Basin does not control Coteau's mining operations, because such provisions protecting Basin's interests, providing for dispute resolution and independent audits, and allocating various risks between Basin and Coteau would be unnecessary if Basin controlled Coteau.

The Agreement also does not restrict Coteau to sell coal only to DCC or to Basin. It provides, as is only reasonable in a requirement contract, that Coteau must fulfill its supply obligation to DCC before selling to other customers, and that for the first ten years of the contract, Coteau must obtain Basin's approval before selling more than two million tons of coal per year to other customers. As the PSC states, Coteau is thus not restricted to selling coal only to DCC or to Basin, nor is Coteau required to sell the particular coal leased from Basin to DCC.

The Agreement includes a provision for the approval of Coteau's mining plan by DCC at DCC's request. The plan is specifically described as a plan "to furnish Dakota's [DCC's] Requirements," and a submitted plan is deemed approved by DCC unless DCC objects to it within seventy-five days of receipt. As part of a requirement contract, such an approval provision, especially when review is not periodic, but only upon request, and when coupled with a default position of approval, indicates not control but protection of supply. The PSC also noted that the only substantive restriction on Coteau's mining plans stated in the Agreement is that the plan "shall be in accordance with sound engineering and design practices and applicable laws, rules and regulations," which simply states that Coteau must use common sense and obey the law; not unreasonable expectations in an arm's length business transaction.

Further, the PSC examined the quantity of coal leased by Coteau from Basin, and the governing lease agreement. All coal leased by Coteau from Basin and Basin subsidiaries constituted about 5.8% of the total tonnage of Coteau's coal reserves. The lease agreement stated that "[t]he timing, nature and extent of Lessee's operations, if any, under this Agreement shall be at the sole discretion of Lessee." The PSC reasoned that the amount of coal leased from Basin by Coteau should be compared to Coteau's total reserves, rather than only to the reserves covered by the specific permit at issue. This is logical, because under the Agreement, Coteau provides coal to DCC from any of its tracts, not only from the tract covered by this permit. In addition, the PSC notes that because Coteau holds permits for tracts in which none of the coal is leased from Basin, if ownership and control is analyzed permit-by-permit, under some permits Coteau would have no connection to Basin, and under others, a relationship giving rise to the presumption of ownership and control would

exist. Since the question is not whether Basin controls Coteau in terms of a specific contract, but whether Basin overall controls Coteau's mining operations, it makes no sense to tie the analysis of ownership and control to some permits and not to others. Further, we gather that the AVS links entities, not permit-by-permit, but overall.

Finally, the PSC summarizes several signifiers of Coteau's independent operation:

> With respect to permits and operations at the Freedom Mine:
>
> a. The premining engineering work (including development of mining plans) and the work needed to obtain the many permits needed for a mining operation is done by Coteau.
>
> b. Coteau is solely responsible for all reclamation work and compliance with other environmental laws and regulations applicable to the Freedom Mine.
>
> c. The people working at the Freedom mine are employees of Coteau, and Coteau is responsible for all hiring and firing. Coteau employs its own professional support staff including engineers, environmental specialists and administrative staff.
>
> d. Coteau, or contractors hired by Coteau, put in place all permanent mine facilities and equipment such as draglines that had to be erected onsite.
>
> e. All permits needed for operating the Freedom Mine are in Coteau's name.
>
> f. All personnel, environmental and safety policies and procedures for the Freedom Mine are developed and implemented by Coteau.
>
> g. Coteau negotiates, acquires and maintains all surface lands, easements, leases and mining rights.

PSC Report of Investigation, Case No. RC–1093–92–1137, at 8–9.

The PSC, in making its determination that Coteau had rebutted the presumption of ownership and control arising from § 733.5(b)(6) by showing that Basin did not have authority to determine the manner in which Coteau's operations were conducted, addressed the relevant connections between Basin and Coteau. It came to the conclusion that, although Basin and Coteau were connected through contractual agreements, such agreements were at arm's length, and the provisions in them were designed to protect each party's interests, not to establish Basin's control over Coteau's operations. In fact, if Basin did control Coteau, the provisions designed to protect Basin would not be necessary, as Basin's and Coteau's interests would not diverge if Basin controlled Coteau. The PSC also produced an impressive list of key operating activities over which Coteau maintained control.

### iii. OSM Response and Review

█ OSM's initial response to the PSC's determination was appropriately deferential; on January 14, 1993, Snyder stated in a letter to North American, Coteau's parent corporation, that he found the PSC determination to be correct, after reviewing the union's complaint and the PSC report. This decision was confirmed in a letter to the local OSM field office on January 19, which stated that "[b]oth parties [Coteau and Basin] are only bound by the terms of the [Agreement]. Any determination beyond this shows a lack of understanding of normal business contracts between buyers and sellers." This statement implicitly refers to the AVS Memo, issued prior to Snyder's decision, which characterized the mining plan approval and cost-plus provisions as creating control by Basin of Coteau's operations. The AVS Memo shows no deference to the PSC's interpretation of these provisions, and flatly refuses to consider the commonplace nature of these types of provisions in large-scale utilities contracts, insisting that these provisions would be examined on a case-by-case basis.[9]

---

9. We note that, far from being an unusual contractual provision designed to evade SMCRA regulations, cost-plus provisions are used by the federal government itself. *See* 59 Fed.Cont.Rep. (BNA) 9 (Mar. 8, 1993) (in the 1992 fiscal year, 27.2% of the Department of Defense's procurement budget spent on contracts for more than $25,000 was disbursed under cost-reimbursement contracts). The mining plan approval provision also strongly resembles provisions reserving approval rights to the federal government over federal coal mining plans on property it

After the change in federal administrations, the new acting director of the OSM withdrew the previous decision and issued a FAD which determined that Coteau was controlled by Basin. The FAD makes no pretense of applying, to the PSC determination, the deferential standard of review mandated by OSM's own regulations.

The FAD states that, in coming to a decision, "OSM has reviewed all documents which have been submitted to the agency with regard to this lengthy proceeding. In substance, we have conducted a *de novo* proceeding, taking a fresh look at the issues. After conducting such a review, OSM finds that Basin owns or controls Coteau within the provisions of 30 C.F.R. §§ 773.5(a)(3) and 773.5(b)(6)." OSM FAD at 8. The regulations simply do not permit OSM to conduct a *de novo* review of the PSC's determination, and in the FAD, OSM states that they are conducting just such a review. Astonishingly, the FAD cites 30 C.F.R. § 842.11(b)(1)(ii)(B) for its authority to determine whether the PSC's response to the ten-day notice was appropriate, but fails to take any notice whatsoever of the paragraph in the very provision cited that defines any action by the state authority that is not arbitrary, capricious, or an abuse of discretion as "appropriate." OSM's *de novo* review thus was not in accordance with law.

Further, both the withdrawal of Snyder's decision supporting the PSC and the ensuing reversal of the PSC's determination are arbitrary. The FAD states three reasons for its withdrawal of the previous director's determination:

(1) it appeared that the former Director did not consider the entire record available to OSM at the time of the Decision; (2) a preliminary analysis of the information then available to the former Director indicated that his decision was not supported by the weight of the evidence; (3) one day after announcing that he agreed with the PSC's decision, the former Director recused himself from further participation in matters "involving specific persons associated with or issues involving" North American, among others.

OSM Final Agency Decision (Aug. 18, 1993).

None of these reasons adequately supports the withdrawal of the former director's decision. The director's initial letter indicated that he had considered the complaint and the PSC's report, which discussed each of the relevant connections between Coteau and Basin. Although the FAD cites the previous director's failure to explicitly rely on the entire record in stating his determination, the FAD itself, in its discussion of the agreements between Basin and Coteau, does not cite any evidence that is not discussed in the PSC's report; there is no smoking gun in the record that the previous director could have overlooked. The letter confirming the director's decision refers explicitly to the agreements as normal business contracts, implying both that the agreements had been considered, and that the AVS Memo had been read. Thus, the previous director had considered and had based his determination on the relevant record.

Second, as discussed above, the standard the OSM is to apply to the PSC's decision is not whether it is supported by the "weight of the evidence," but whether it was arbitrary or capricious. This standard is considerably more deferential than one determining whether a decision was supported by the weight of the evidence: whether the previous director's decision was supported by the weight of the evidence is immaterial.

Third, the FAD cites the previous director's recusal after issuing the determination that the PSC was correct as support for withdrawing the determination, but provides no evidence that impropriety occurred regarding the determination at issue. Without more, a later recusal does not provide reason for invalidating a previous determination.

In the FAD, OSM relies on *Belville Mining Co. v. United States*, 999 F.2d 989 (6th Cir.1993), to support its contention that the withdrawal was appropriate. In *Belville*, the court found that withdrawal of previous OSM decisions after a change in administrations was not arbitrary because the previous deci-

leases to operators. *See* 43 C.F.R. § 3482.1(b), (c) (1993).

sions were inadequate. The court cited the brevity of the letter announcing the decisions, and its lack of legal analysis or factual determinations, *id.* at 999, finding that, because the reason for reconsideration was a legitimate concern that the decisions were inadequate, "[t]his case is thus distinguishable from a situation in which an agency uses 'the power to correct inadvertent ministerial errors ... as a guise for changing previous decisions because the wisdom of those decisions appears doubtful in the light of changing policies.'" *Id.* at 998 (quoting *American Trucking Ass'ns, Inc. v. Frisco Transp. Co.,* 358 U.S. 133, 146, 79 S.Ct. 170, 177, 3 L.Ed.2d 172 (1958)). We find that *Belville* is inapplicable here, and that OSM indeed decided that the withdrawn decision was doubtful in the light of changing policies. The OSM decisions withdrawn in *Belville* were original OSM determinations of rights, not based on deferential review of primacy state regulatory determinations. *Id.* at 991. OSM cites the brevity of Snyder's letter announcing his determination that the PSC was correct as creating a situation analogous to *Belville,* but fails to recognize that Snyder appropriately relied on the PSC report to provide the legal and factual reasoning behind his determination. Upholding a decision under an arbitrary and capricious standard does not require the enunciation of reasoning that an original determination does: the upheld decision itself provides the reasoning. We therefore find that the withdrawal of Snyder's decision was arbitrary.

The FAD also offers no evidence that the PSC's determination was arbitrary or capricious. The determination of ownership and control rests almost entirely on the Agreement's mining plan approval and cost-plus provisions, both considered by the PSC and dealt with in the PSC's report in a reasonable manner. Far from identifying a "clear error in judgment" in the PSC's report, the FAD consists of flat assertions that the mining plan approval and cost-plus provisions demonstrate control. This contrasts with the PSC's careful analysis of these provisions as designed to allocate risk and protect each party's interests, and with the previous OSM administration's view that these are "normal business contracts."

Further, the FAD cites as the primary basis for its decision the AVS Memo, which also engaged in a *de novo* review of the allegations of ownership and control, giving no deference to the PSC's determination. The AVS Memo, too, consists largely of conclusory assertions that the mining plan approval and cost-plus provisions constitute control by Basin. In the AVS Memo, the cost-plus arrangement is criticized as eliminating Coteau's risk as to changes in mining costs. The AVS Memo itself, however, goes on to note that the cost-plus arrangement also benefits Basin by providing a prearranged price that offers "predictability and insulation against market fluctuations." AVS Memo at 4. The AVS Memo fails to observe that this arrangement then makes perfect sense as an arm's length exchange between Basin and Coteau, as opposed to an indicator of control, which was the assessment made of the cost-plus arrangement in the PSC's determination. We find that the reversal of the PSC's determination was arbitrary.

We find that Coteau has shown a strong likelihood of success on the merits in its action against the enforcement of OSM's Final Agency Decision.

## 2. Irreparable Injury

The district court found, without discussion, that Coteau would not suffer irreparable injury from OSM's determination that it was controlled by Basin. The only support the court offers for this finding is that OSM "made representations regarding handling which obviate the claims of irreparable injury." Mem. and Order at 5 (Nov. 23, 1993). These representations would appear to be those made in OSM's letter of September 9, 1993, responding to Coteau's request for information regarding the immediate impact of the FAD. They are not very comforting. The letter states that, although Coteau is not currently linked to any violating parties, Coteau must comply with the information requirements of 30 C.F.R. § 778.13, and states that "[i]t has now come to our attention that there may be outstanding violations on one or more of the sites owned or controlled by either [Coteau or Basin]." OSM has agreed

to allow Coteau, for pending permit applications, to use the information already on file regarding Basin. Basin, however, has exited the mining business, and will presumably not be updating its files. Coteau will be required to provide up-to-date information regarding Basin and its links in its permit applications.

Under § 778.13, Coteau must now provide detailed information, including violation information, in each of its permit applications regarding not only Basin itself, but regarding any other entity linked through ownership or control to Basin. Ownership and control presumptions are formed by, for instance, being an officer or director of an entity, being an owner of record of more than 10% of an entity, being a general partner of a partnership, or having the ability to commit the financial or real property assets or working resources of an entity. 30 C.F.R. § 773.5(b). OSM has created no specific standards to guide applicants in applying the more general ownership and control provision which finds ownership or control when one person has authority directly or indirectly to determine the manner in which the mining operation is conducted. *Id.* As the instant case illustrates, determination of ownership or control is often unclear, and Coteau now runs the risk of submitting incomplete permit applications if it does not invest sufficient effort in investigating Basin's ownership and control links, or if it makes an incorrect judgment whether an ownership or control link exists.

Further, if any one of these links is found to be in violation of SMCRA or federal or state regulations, Coteau's permits are in jeopardy of suspension or rescission. N.D.Admin.Code §§ 69–05.2–32–01.3, 69–05.2–32–02.3, .4. Coteau currently has pending, or will file within the next six months, five *permit revision applications of a total of seven permits held by Coteau. Coteau is almost constantly in the process of renewal, revision or review of its permits. Delay, denial or suspension of these revisions would clearly cause Coteau serious difficulties in meeting its contractual obligations, if not make it impossible to meet them. Coteau has no power to cause Basin, or entities linked to Basin, to remedy a violation, should one occur. Thus, if Basin or its linkages commit a violation and refuse to remedy it, Coteau could lose its permits indefinitely. The consequences to Coteau of, through no fault of its own, breaching a contract will be irreparable once they have occurred, and a preliminary injunction will ensure that Coteau suffers no loss during the pendency of this case. *See Glenwood Bridge,* 940 F.2d at 372 (holding that potential loss of a contract constitutes irreparable injury).

We find that the district court erred in finding that Coteau would suffer no irreparable injury if its motion for a preliminary injunction were denied.

### 3. Injury to Other Parties and Public Interest

The district court failed to address these two prongs of the test for preliminary relief in its order.

▪ The injury inflicted on other parties by granting Coteau a preliminary injunction in this case is minimal. OSM will suffer no harm if they wait until the case is adjudicated on the merits. They are fully aware, obviously, of the potential link between Coteau and Basin, and, as OSM itself has pointed out, Basin's current ownership and control information is readily available to OSM through Basin's own permit applications.

▪ Public interest, too, does not weigh against the grant of a preliminary injunction to Coteau. The central public policy goal of SMCRA is to protect the environment and public health and safety: again, as OSM itself points out, Coteau has an exemplary record of regulatory compliance, and Basin has no outstanding violations. If Basin or an entity linked to it commits a violation, Basin will be directly responsible for its remedy. As we noted above, Coteau has no power to cause Basin to correct a violation, and thus OSM does not lose if Coteau is granted preliminary relief. The AVS system was created for the purpose of identifying violators who might try to avoid abating their violations by continuing to mine in revised corporate form. There is no showing that either Basin or Coteau has any violations to avoid, or that linking Coteau to Basin will aid in the

remedying of future violation. There is, therefore, no indication that the public policy goals of SMCRA will suffer if Coteau is granted a preliminary injunction.

Because all four of the *Dataphase* factors weigh in favor of granting a preliminary injunction to Coteau, we find that the district court abused its discretion when it denied Coteau's motion, and remand with instructions to grant Coteau's motion for a preliminary injunction.

## C. Dismissal on the Merits

■ Finally, the district court's dismissal with prejudice of this action on the merits was distinctly premature. First, as discussed above, we find that Coteau has a strong likelihood of success on the merits, which weighs against an early dismissal. Second, Coteau was not given notice of the court's intention to consolidate the hearing on the motion for preliminary injunction with a trial on the merits, so Coteau had no opportunity to present a complete case. OSM's answer to Coteau's complaint was filed one week before the district court entered its order, giving Coteau little notice of OSM's defenses, and the full administrative record was never filed, giving neither Coteau nor the court the opportunity to examine it. The parties "should normally receive clear and unambiguous notice" of consolidation, *University of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981), enabling them to avoid just such short shrift as was given to Coteau. We reverse the district court's dismissal on the merits, and remand for further proceedings.

## III. CONCLUSION

We hold that the district court abused its discretion when it denied Coteau's motion for preliminary relief because Coteau made a strong showing of likelihood of success on the merits of its case, and a showing of irreparable harm and no injury to other litigants or to public policy goals. In addition, we hold that the district court erred when it dismissed the case on the merits. We therefore reverse the district court's denial of preliminary relief with instructions to grant Coteau's motion for preliminary injunction, and reverse the dismissal on the merits, remanding the case for reinstatement and trial.

HEANEY, Senior Circuit Judge, dissenting.

The teapot tempest which Judge Conmy so poetically evoked in his Order below[1] appears to have inspired a burst of unwarranted judicial enthusiasm to decide issues not properly before this court.

Accurately viewed, this is a case in which a federal agency applied an insufficiently deferential standard of review to the determination of a state agency. The appropriate remedy is to send the matter back to Office of Surface Mining, Reclamation and Enforcement (OSM) and to require that the agency perform its review under the correct standard. Because I cannot concur in straying beyond those parameters, I respectfully dissent from the court's decision to grant preliminary injunctive relief.

The court's opinion is flawed in two respects. First, the majority opinion steps well beyond the bounds of what is required to adjudicate this appeal by reaching to find—on the basis of an inadequately developed record—that no linkage exists between Basin and Coteau. Even if that question were properly before us at this time, I cannot agree with the majority opinion that OSM's determination of linkage was arbitrary and capricious. Second, no credible showing of irreparable harm has been made. In light of Coteau's concession that no outstanding violations exist and OSM's assurance that compliance with its Final Agency Decision (FAD) requires Coteau merely to verify the accuracy of already-extant OSM data to the best of its current knowledge, the record establishes, at most, that Coteau faces an uncertain and contingent possibility of reparable harm at some point in the nebulous future.

### I.

It is clear, and the majority correctly concludes, that OSM should have reviewed the

---

1. The Order begins with this image: "The tempest is raging. Waves tower, winds shriek, spume blows and the tea bag cowers in the dark confines of the pot." *Coteau Properties Co. v. U.S. Dep't of Interior,* No. A1–93–112, Order at 1 (D.N.D. Nov. 23, 1993).

linkage determination of the North Dakota Public Service Commission (PSC) only for arbitrary or capricious action or abuse of discretion. *See* 30 C.F.R. § 842.11(b)(1)(ii)(B). As administrative law has evolved over recent decades, courts have nevertheless adhered to the principle that the appropriate remedy for agency errors of law is a remand so that the agency can get it right, properly fulfilling its statutory mandate and employing its particular expertise. Under the Administrative Procedures Act (APA), the duty of this court is to "hold unlawful and set aside agency action, findings and conclusions found to be ... not in accordance with law ... [or] without observance of procedure required by law...." 5 U.S.C. § 706(2)(A), (D).

The Supreme Court has elaborated upon the reviewing court's limited remedial role:

When an administrative agency has made an error of law, the duty of the Court is to "correct the error of law committed by that body, and after doing so to remand the case to the [agency] so as to afford it the opportunity of examining the evidence and finding the facts as required by law."

*N.L.R.B. v. Enterprise Ass'n of Steam, Hot Water, Hydraulic Sprinkler, Pneumatic Tube, Ice Machine & Gen. Pipefitters of New York, Local Union No. 638,* 429 U.S. 507, 522 n. 9, 97 S.Ct. 891, 900 n. 9, 51 L.Ed.2d 1 (1977) (quoting *I.C.C. v. Clyde S.S. Co.,* 181 U.S. 29, 32–33, 21 S.Ct. 512, 513–14, 45 L.Ed. 729 (1901)). In other words, where administrative error has been identified, a reviewing court "should ordinarily remand the matter to the agency rather than compensat[e] for the agency's oversight by launching a freewheeling judicial inquiry into the merits." *R.I. Higher Educ. Assistance Auth. v. Secretary, U.S. Dep't of Educ.,* 929 F.2d 844, 857

(1st Cir.1991). *Accord, e.g., Couty v. Dole,* 886 F.2d 147, 149 (8th Cir.1989); *Pollgreen v. Morris,* 770 F.2d 1536, 1544 (11th Cir.1985).

There is little evidence in the record before us to suggest that a remand will prove futile, *see Thornburgh v. American College of Obstetricians & Gynecologists,* 476 U.S. 747, 756 n. 7, 106 S.Ct. 2169, 2176 n. 7, 90 L.Ed.2d 779 (1986) (remand not required in cases of futility), or that OSM will carry out its properly deferential review other than in good faith and with diligence. "[T]he general rule in administrative law cases is that courts, upon finding that an agency made an error of law, are not to presume that an agency will adhere to its original decision notwithstanding its prior misconception of the legal standards." *Florida Dep't of Labor & Employment Sec. v. U.S. Dep't of Labor,* 893 F.2d 1319, 1324 (11th Cir.1990).

Thus, given the authorities counselling a remand, I can find scant justification for the majority opinion's lengthy digression into the merits of the linkage determination. Our role as a reviewing court is to keep OSM within its statutory bounds, not to make decisions committed to the agency by Congress.

The improvidence of reaching the merits in this case is aggravated by the inadequacy of the record before us. The OSM should have the opportunity to review the North Dakota PSC's determination that no linkage exists in light of the appropriate standard of review. The reasoning behind the resulting agency FAD would then be subject to challenge in the district court on the merits and with the benefit of expert agency analysis rooted in a properly developed record.

While I recognize that the majority opinion's linkage analysis constitutes dicta,[2] I set

---

2. The "substantial likelihood of success on the merits" prong of the *Dataphase* test constitutes mere predictive forecasting entitled to no real weight when the merits of the dispute ultimately reach the trial court. The law of the Eighth Circuit on this point could not be clearer:

A preliminary injunction is not a decision upon the merits of the underlying case. As we stated in *Benson Hotel Corp. v. Woods,* 168 F.2d 694, 697 (8th Cir.1948):

It must be borne in mind that the parties did not submit the case to the trial court on its merits. * * * The decision of the trial court

on granting the motion for preliminary injunction will not estop either of the parties on the trial of the case on its merits, nor would any determination of those questions by this court on appeal be binding on the trial court nor upon either of the parties in considering and determining the merits of the controversy.

*Campbell "66" Exp., Inc. v. Rundel,* 597 F.2d 125, 130 (8th Cir.1979). Thus, even after today's decision on preliminary injunctive relief, it is well within the discretion of the district court to remand the linkage question back to OSM for a

forth, briefly, what I consider to be some of its more serious flaws. The majority opinion holds that (1) OSM's withdrawal of former director Harry Snyder's decision was arbitrary, and (2) OSM's finding of linkage was arbitrary. Both of these conclusions seem to me to run counter to the weight of the evidence made available to us.

First, OSM's decision to withdraw the former director's determination cannot be considered arbitrary in light of the strong appearance of impropriety it created. Only a day after handing down his decision upholding the linkage finding of the PSC, thereby adopting a position of considerable benefit to Coteau, Snyder recused himself from participation in any matters concerning Coteau's parent corporation or its affiliates, including Coteau. Alone, that sequence of events warranted legitimate suspicion of Snyder's motives and justified the withdrawal of his determination. To hold that Snyder's actions did not justify the reexamination of his assessment is to ignore the critical importance in a democracy of avoiding even the appearance of impropriety in governmental decisionmaking. I take strong exception to the majority opinion's suggestion that only "smoking gun" evidence of impropriety will suffice to justify the withdrawal and reconsideration of a former official's determination. Moreover, bolstering his contention that he sought not to grind a political axe but to get to the bottom of the matter, Snyder's successor requested and received additional information and analysis from Coteau, Basin, and OSM staff before weighing the evidence and issuing the agency's FAD. The process by which OSM's FAD was arrived at may have been somewhat messy, but it was not arbitrary and capricious.

Second, the incomplete record before us contains considerable support for the proposition that Coteau and Basin are linked by a relationship of ownership or control within the meaning of 30 C.F.R. § 778.13(c). As then-Judge Scalia set forth in *Ass'n of Data Processing Serv. Orgs. v. Board of Governors of the Fed. Reserve Sys.*, 745 F.2d 677, 683 (D.C.Cir.1984), agency action will not be set aside as arbitrary unless it is unsupported by

proper determination under the arbitrary and

"substantial evidence." Evidence is substantial under the APA if it is "enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion to be drawn ... is one of fact." *Id.* at 684 (quoting *Illinois Cent. R.R. v. Norfolk & Western Ry.*, 385 U.S. 57, 66, 87 S.Ct. 255, 260, 17 L.Ed.2d 162 (1966)). Under that standard, the pages of facts and arguments set forth in OSM's FAD are sufficient to withstand arbitrary and capricious review at this stage. Both sides concede that as a matter of law Coteau is presumed to be "owned or controlled" by Basin on the basis of their contractual relationship. The question, then, is whether Coteau has adequately rebutted that presumption. The PSC certainly felt that the presumption had been rebutted, but OSM concluded otherwise, finding that Basin retained the ability to exercise control over Coteau's operations. FAD at 9. Ultimately, this is a fact-intensive determination that must be reviewed by OSM under the arbitrary and capricious standard.

## II.

Even if this court were justified in usurping the role of OSM in making the "linkage" determination, no preliminary relief should be granted because Coteau has failed to establish that it will suffer irreparable harm while this case is pending. Such a showing is required by the first prong of the *Dataphase* test. *See Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 113 (8th Cir.1981).

The majority opinion rests its finding of irreparable harm on a series of, at best, contingent possibilities. The majority opinion's language is telling: "*[I]f* Basin or its linkages commit a violation *and* refuse to remedy it, Coteau *could* lose its permits indefinitely." *Supra* at 1480 (emphasis added). The court goes on to speculate that a loss of permits would cause Coteau to breach contracts, and that such breaches would then be irreparable.

The majority opinion ignores the fact that a number of obstacles stand between Coteau and the denial or suspension of its mining permits. First, OSM reports that currently

capricious standard of review.

neither Basin nor any of its owners or controllers have unabated violations requiring permit denial or suspension. Interior Br. at 37. Basin has ceased mining operations entirely. Any violations committed by Basin's owners and controllers will not limit Coteau's ability to renew its existing permits, because the regulations provide that permittees are entitled to renewal unless there exists a violation at the permit site in question. 30 C.F.R. §§ 774.15(a), (c). Thus, Coteau's ability to meet its existing contractual obligations is not likely to be endangered by the actions of third parties. Second, OSM's regulations provide for elaborate due process procedures prior to any deprivation of permits, including notification letters and opportunities for notified parties to rebut the claim.

In the meantime, the actual burden imposed on Coteau by the FAD is negligible due to OSM's willingness to allow Coteau to meet its reporting obligation by certifying that the linkage data on OSM's AVS computer system regarding Coteau and Basin is accurate to the best of Coteau's knowledge. Gov't Br. at 38. Such a burden falls far short of irreparable harm.

As this court indicated in *Columbia Transit Corp. v. Jones,* 572 F.2d 168, 173–74 (8th Cir.1978), merely hypothetical threats of future harm are insufficiently immediate to justify the granting of preliminary relief. Should a sufficient number of the feared contingencies take place so as to place Coteau in immediate danger of losing permits, Coteau will have an unimpeded opportunity to seek and obtain a preliminary injunction against OSM. At this time, however, the threat of irreparable harm is simply too distant and speculative to warrant preliminary relief.

### III.

In sum, I would refrain from addressing the merits of the linkage dispute and would affirm the district court's denial of Coteau's motion for preliminary relief. Accordingly, I respectfully dissent.