33 F.3d 319
 39 ERC 1253, 63 USLW 2155, 25 Envtl.
L. Rep. 20,294
 APPALACHIAN ENERGY GROUP; Independent Oil and Gas
Association of New York; Independent Oil and Gas
Association of Pennsylvania; Independent Oil and Gas
Association of West Virginia; Kentucky Oil and Gas
Association; Ohio Oil and Gas Association; New York State
Oil Producers Association; Pennsylvania Oil and Gas
Association; Tennessee Oil and Gas Association; Virginia
Oil and Gas Association; West Virginia Oil and Natural Gas
Association, Petitioners,
v.
ENVIRONMENTAL PROTECTION AGENCY, Respondent.
 No. 93-2146.
 United States Court of Appeals,
Fourth Circuit.
 Argued April 11, 1994.
Decided Aug. 23, 1994.
 
 ARGUED: David Michael Flannery, Robinson & McElwee, Charleston, WV, for petitioners. Karen Lee Egbert, Environment and Natural Resources Division, U.S. Dept. of Justice, Washington, DC, for respondent. ON BRIEF: Kathy G. Beckett, Robinson & McElwee, Charleston, WV, for petitioners. Lois J. Schiffer, Acting Asst. Atty. Gen., Environment and Natural Resources Div., U.S. Dept. of Justice, Washington, DC; Susan Lepow, Associate Gen. Counsel, Stephen J. Sweeney, Office of Gen. Counsel, U.S. E.P.A., Washington, DC, for respondent.
 Before ERVIN, Chief Judge, NIEMEYER, Circuit Judge, and RESTANI, Judge, United States Court of International Trade, sitting by designation.
 Application dismissed by published opinion. Judge NIEMEYER wrote the opinion, in which Chief Judge ERVIN and Judge RESTANI joined.
 OPINION
 NIEMEYER, Circuit Judge:
 
 
 1
 By a memorandum internal to the United States Environmental Protection Agency (EPA) dated December 10, 1982, the NPDES (National Pollutant Discharge Elimination System) Program Branch Chief, responding to an inquiry from an EPA regional storm water coordinator, advised the coordinator that an NPDES permit is required for "storm water discharges from construction activities involving oil and gas facilities (e.g., access roads, drilling pads, pipelines, etc.)."[1] Discovery of this memorandum several months later alarmed companies in the oil and gas industry because the Clean Water Act exempts from any permit requirement uncontaminated "discharges of storm water run-off from mining operations or oil and gas exploration, production, processing, or treatment operations or transmission facilities." 33 U.S.C. Sec. 1342(l )(2). Oil and gas companies feared that the EPA was attempting, under the guise of an internal legal interpretation, to impose an unauthorized regulation on oil and gas operations by requiring a permit for every exploratory activity, because almost every such activity inherently involves some construction.
 
 
 2
 Appalachian Energy Group, an ad hoc affiliation of nine trade associations in the oil and gas industry, initiated this action in this court, challenging the EPA's memorandum. The group, which consists of oil and gas operators in seven Appalachian region states (Kentucky, New York, Ohio, Pennsylvania, Tennessee, Virginia, and West Virginia), represents ownership of approximately 200,000 wells. The group requests that the December 10 memorandum be declared unlawful and that this court set it aside because (1) it is inconsistent with the Clean Water Act,[2] and (2) it amounts to a new rule, adopted without proper notice under the Administrative Procedure Act. The group contends that if permits were to be required, as indicated in the December 10 memorandum, the ability of its members to compete in the marketplace would be substantially impaired. It asserts that a mere $200 per year increase in the cost of operating a well would force nearly 20% of the wells in the Appalachian area to be plugged, and a $2,000 per year increase would make nearly one-half uneconomical. As they summarize in their brief:
 
 
 3
 Put simply, the number of wells in Appalachia and the fragile economics of these wells make Appalachian oil and gas operations particularly sensitive to any unjustified expansion of EPA's storm water regulatory program.
 
 
 4
 The Appalachian Energy Group invokes the jurisdiction of this court under section 509(b)(1)(F) of the Clean Water Act, 33 U.S.C. Sec. 1369(b)(1)(F) (conferring jurisdiction on the courts of appeals to review the EPA Administrator's action "in issuing or denying any permit" under 33 U.S.C. Sec. 1342), and under the decision in Natural Resources Defense Council v. EPA, 966 F.2d 1292 (9th Cir.1992) (finding appellate court jurisdiction to review EPA "rules that regulate the underlying permit procedures"). Contending that this court is without jurisdiction, the EPA points out that the December 10 memorandum did not issue or deny a permit, and notwithstanding the opinion given in the memorandum, to date it has not demanded a permit for uncontaminated storm water runoff from oil and gas construction activities. Accordingly, the EPA argues that this court may not at this stage review the substance of the December 10 memorandum or the circumstances of its issuance.[3] While the Appalachian Energy Group recognizes that the December 10 memorandum does not itself involve the issuance or denial of a permit, it nevertheless argues that the memorandum constitutes a rule "underlying a potential permit application" and therefore its review falls within the jurisdiction of this court. See Natural Resources Defense Council, 966 F.2d at 1297. For the reasons that follow, we agree that this court lacks jurisdiction to review the memorandum.
 
 
 5
 In deciding whether we have jurisdiction, we must first resolve the nature of the December 10 memorandum, identifying and categorizing the official EPA action, if any, that it involves. The December 10 memorandum is a brief one-paragraph statement that was sent within the EPA from one official to another in response to an inquiry. The inquiry apparently sought an answer to the question of "whether a permit is required for storm water discharges from construction activities involving oil and gas facilities." The EPA Branch Chief provides a two-sentence response and then concludes, "I hope this memorandum addresses your concerns. Please call me if you have further questions." On its face, the memorandum does not approve the issuance or denial of a permit; it does not facially involve or relate to a pending decision to issue or deny a permit; and, accepting the EPA's representation, it has not been used to issue or deny a permit. Moreover, on its face the memorandum does not purport to issue a new rule. It only provides the writer's interpretation of two regulations apparently in tension (40 C.F.R. Sec. 122.26(b)(14)(x) and 40 C.F.R. Sec. 122.26(c)(1)(iii)), concluding that permits are required for storm water discharges from construction activities even when they involve oil and gas operations.
 
 
 6
 Going beyond the face of the memorandum, we are unable to find anything in the record or briefs that indicates why the opinion was solicited by the EPA coordinator and the purposes for which it was used. Appalachian Energy Group does note that pursuant to a question posed by its counsel to the EPA's Region III coordinator, the coordinator transmitted to counsel a copy of the December 10 memorandum. But we find nothing in the record to indicate what question was directed to the Region III coordinator. Thus, the "action" of the EPA Administrator which Appalachian Energy Group seeks to have reviewed can only be the generation of an internal memorandum expressing an opinion and the transmission of that memorandum to the public.
 
 
 7
 Section 509(b) of the Clean Water Act confers jurisdiction on the courts of appeals to review, upon application filed by an interested person, only specified actions of the EPA Administrator. Section 509(b)(1)(F), the particular provision on which Appalachian Energy Group relies, gives the courts of appeals the power to review the EPA Administrator's action "in issuing or denying any permit under section 1342 of this title." 33 U.S.C. Sec. 1369(b)(1)(F). Thus, the text of the Clean Water Act permits us to review only those categories of agency action identified. See Westvaco Corp. v. EPA, 899 F.2d 1383, 1387 (4th Cir.1990). And even then, we review any such action only if it constitutes a final agency action. See Champion International Corp. v. EPA, 850 F.2d 182, 187-90 (4th Cir.1988) (holding that an EPA objection to the state's issuance of a permit is not reviewable; only the issuance of the permit would be reviewable); American Paper Institute, Inc. v. EPA, 882 F.2d 287, 289 (7th Cir.1989) (holding that EPA's regional "policy statement" on dioxin tolerances is not reviewable; only the denial or modification of a permit would be reviewable).
 
 
 8
 While the memorandum in this case may signal the position that the EPA might eventually take, the EPA has not taken any action at this point triggering our power to review its position. Certainly, in its December 10 memorandum, the EPA did not issue or deny any permits to petitioner or threaten such action. Thus, up to this point in time, its action does not fall within the limited class of actions for which review is authorized by 33 U.S.C. Sec. 1369(b)(1)(F). Moreover, to the extent that the EPA's action in this case is a only predictor of future action, it is not yet a "final action" subject to judicial review.
 
 
 9
 Appalachian Energy Group's reliance on Natural Resources Defense Council v. EPA, 966 F.2d 1292 (9th Cir.1992), does not advance its argument. The court there recognized that it might have jurisdiction under 33 U.S.C. Sec. 1369(b)(1)(F), since activities relating to the issuance or denial of permits were involved. But the scope of agency activity there was also alleged to be broader than simply issuing and denying permits. The petitioners in Natural Resources Defense Council sought to declare unlawful the EPA's failure to issue certain storm water permitting regulations and the EPA's extension of certain statutory deadlines; they sought to enjoin the EPA from granting future extensions; and they sought to compel the EPA to include deadlines for permit approval or denial and for permit compliance consistent with the statute. Since the parties there did not specify the particular section on which they relied for subject matter jurisdiction, the court went on to make the general statement about its jurisdiction, for which it provided no authority, that it "also had the power to review rules that regulate the underlying permit procedures." 966 F.2d at 1297. We can only speculate about the source of the court's authorization, recognizing that subsections (A), (C), and (E) of Sec. 1369(b)(1) provide for review of the EPA administrator's action in promulgating certain standards under specified sections of the Clean Water Act, and subsection (D) provides for review of determinations "as to a state permit program submitted under section 1342(b)."
 
 
 10
 In contrast, Appalachian Energy Group's only stated interest here is knowing whether its members must obtain permits for uncontaminated storm water runoff from construction activities undertaken in connection with oil and gas operations. Since we are not presented with any agency action involving the issuance or denial of a permit and the actions by the EPA thus far do not constitute final agency action, we lack subject matter jurisdiction to review the December 10 memorandum. Accordingly, we dismiss the application for review.
 
 
 11
 DISMISSED.
 
 
 
 [1]
 The complete memorandum, which lies at the center of this litigation, provides:
 To: Vern Berry
 Region VIII Storm Water Coordinator (8WM-C)
 From: Ephraim King, Chief
 NPDES Program Branch (EN-336)
 Subject: Applicability of NPDES Storm Water Regulations to Discharges from Construction Activities Involving Oil and Gas Facilities
 The purpose of this memorandum is to respond to your memorandum that asked whether a permit is required for storm water discharges from construction activities involving oil and gas facilities (e.g., access roads, drilling pads, pipelines, etc.). All construction operations, including clearing, grading and excavating activities, that disturb five or more acres of land are required to apply for a NPDES permit for the storm water discharges from that site, pursuant to 40 C.F.R. Part 122.26(b)(14)(x), regardless of its affiliation with an oil and gas operation. The exemption afforded to oil and gas operations pursuant to 40 C.F.R. Part 122.26(c)(1)(iii) applies only to the oil and gas operation itself, not associated activities that may fall under different parts of the definition of storm water discharge associated with industrial activity. I hope this memorandum addresses your concerns. Please call me if you have further questions.
 
 
 [2]
 The Appalachian Energy Group also contends that the December 10 memorandum is inconsistent with prior positions taken by the EPA. The group observes that, in adopting regulations implementing the 1987 amendments to the Clean Water Act, the EPA mandated permits for oil and gas operations only when contaminants are discharged and not for uncontaminated storm water runoff. See 40 C.F.R. Sec. 122.26(c)(1)(iii). It also observes that, in adopting Standard Industrial Classification 13 as its definition of oil and gas activities, the EPA commented formally:
 EPA agrees that oil and gas exploration, production, processing, or treatment operations or transmission facilities must only obtain a storm water permit when a discharge to waters of the U.S. ... is contaminated.
 
 
 [55]
 Fed.Reg. 48,031 (Nov. 16, 1990) (emphasis added). Finally, the group pointed out that, in comments to 40 C.F.R. Sec. 122.26(b)(14)(i-x), which require storm water permits for certain construction activities, the EPA identifies the requirements as applying only to the construction industry, and not to construction activities in other industries, such as the oil or gas industry. See 55 Fed.Reg. 48,033 (Nov. 16, 1990)
 
 
 [3]
 The EPA also contends on the merits that the memorandum is an interpretive rule that reasonably and correctly interprets the Clean Water Act, and accordingly it is not subject to the notice requirements of the EPA. See 5 U.S.C. Sec. 553(b). The EPA relies on 26 C.F.R. Sec. 122.26(b)(14)(x) to justify its requiring a permit for all construction activities involving five acres or more of land, including those undertaken as part of oil and gas operations which would otherwise be exempted. Although we recognize the problems that the EPA may encounter in maintaining this position, we do not resolve the dispute at this time in light of our ruling that subject matter jurisdiction is lacking