**ARCH MINERAL CORPORATION,**
Plaintiff,

v.

**Bruce M. BABBITT, Secretary of the Interior United States Department of the Interior, et al., Defendants.**

Civ. A. No. 2:95–0032.

United States District Court,
S.D. West Virginia,
Charleston Division.

Aug. 1, 1995.

Christopher B. Power, Michael B. Victorson and Amy A. Davis, Robinson & McElwee, Charleston, WV, Blair M. Gardner, Senior Counsel, Arch Mineral Corp., St. Louis, MO, for plaintiff.

Rebecca A. Betts, United States Attorney, Charleston, WV, for defendant.

## MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

Pending are the parties' cross motions for summary judgment pursuant to *Rule 56* of the *Federal Rules of Civil Procedure.* The parties agree there are no genuine issues of material fact extant. They have submitted memoranda in support of their respective positions and the matter is mature for the Court's consideration.

### STIPULATED FACTS

Greendale Coals, Incorporated conducted coal mining operations beginning in 1983 on property in Clay and Nicholas Counties, West Virginia under three mining permits issued by the West Virginia Department of Environmental Protection ("WVDEP"). The Greendale operations were conducted pursuant to a September 6, 1983 lease between Greendale and the owner of the property, Clay–Nicholas Minerals Company, a wholly-owned subsidiary of Diamond Shamrock Coal.

Greendale also entered into a contract on September 6, 1983 with Diamond Shamrock Coal Sales Company, another wholly-owned subsidiary of Diamond Shamrock Coal. This contract, styled a "Coal Sales Agency Contract," was terminated by mutual consent of the parties on December 12, 1985.

Greendale incurred abandoned mine lands reclamation fees ("AML fees") totaling approximately fifty eight thousand dollars ($58,000) based on coal production between July 1984 and September 1985.

On September 6, 1986 OSM issued a notice of violation to Greendale. Greendale did not rectify the violation and, because of this, a cessation order was issued by OSM. The cessation order remained effective for the maximum period of thirty days and resulted in a penalty being assessed against Greendale in the maximum amount of twenty-two

thousand five hundred dollars ($22,500.00). This penalty was never paid by Greendale.

OSM initiated a lawsuit against Greendale for the recovery of the AML fees. *United States v. Greendale Coals, Inc.*, No. 2:86–1035 (S.D.W.Va.). Judgment for the government was entered on November 18, 1986, but there was no recovery due to Greendale's subsequent bankruptcy filing on February 27, 1987. *In re Greendale Coals, Inc.*, Case No. 87–50038 (Bkr.Ct., S.D.W.Va.). On April 30, 1987, OSM filed a proof of claim for this civil penalty. On May 27, 1987, OSM filed a proof of claim for Greendale's delinquent AML fees. The bankruptcy case was dismissed on March 15, 1989 without a discharge.

OSM chose not to pursue Diamond Shamrock Coal for the AML fees under Section 402 of the Surface Mining Control and Reclamation Act ("SMCRA"), 30 U.S.C. § 1232, as the "operator" of the Greendale operation and never attempted to collect the delinquent AML fees or unpaid civil penalty from Diamond Shamrock Coal.

On April 17, 1987, Arch Mineral Corporation entered into a contract to purchase the outstanding stock of Diamond Shamrock Coal. At the time of the stock purchase, Diamond Shamrock Coal owned both Clay–Nicholas Minerals and Diamond Shamrock Coal Sales.

Arch provided written notification of its acquisition of Diamond Shamrock Coal to the WVDEP on July 7, 1987.[1] OSM received actual notice of the acquisition on October 20, 1987, when Arch paid AML fees on coal previously mined by Diamond Shamrock Coal.

The operating subsidiaries of Diamond Shamrock Coal underwent rapid change following Arch's 1987 acquisition. One operation in Utah was sold to an unrelated third party. Another in Western Kentucky was closed. Two others remain in operation and are indirect subsidiaries of Arch. Diamond Shamrock Coal's name was changed to Arch Mineral Coal Company and it was dissolved on June 30, 1988.

On May 21, 1993 OSM notified Arch for the first time that it had been identified as a "presumed owner or controller" of the former Greendale operations. Prior to this notice, Arch had been given no billing or any other type of notice of OSM's claims against Greendale or of OSM's intent to enforce such claims against Arch.[2]

OSM alleges Arch is linked through ownership and control to Greendale's liabilities for delinquent AML fees and civil penalty, based on (a) Arch's contract to purchase Diamond Shamrock Coal and (b) OSM's determination that Diamond Shamrock Coal was a presumed owner or controller of Greendale under 30 C.F.R. § 773.5(b)(6).[3]

Based on Greendale's unpaid civil penalty and AML fees, OSM informed Arch that, unless Arch successfully rebuts the ownership and control link it asserts exists between Arch and Greendale, Arch will be placed on the OSM's computerized mine permit-blocking system (known as the "Applicant/Violator System" or "AVS") as permit-blocked because of the link to Greendale's undischarged

---

1. *See* 38 WVCSR § 3.25 (requiring notification of transfer, sale, or assignment of mine permit rights).

2. Copies of OSM's May 21, 1993 and September 30, 1994 notice letters are attached as a part of Exhibit B to Arch's Memorandum in Support of Preliminary Injunction.

3. The regulation states that an entity will be presumed to own or control a surface coal mining operation where the entity is:

> "Owning or controlling coal to be mined by another person under a lease, sublease or other contract and having the right to receive such coal after mining or having authority to determine the manner in which that person or

another person conducts a surface coal mining operation."

30 C.F.R. § 773.5(b)(6). "Owns or controls" is defined as:

> "any one or a combination of the relationships specified in paragraphs (a) and (b) of this definition—
> (a)(1) Being a permittee of a surface coal mining operation; (2) Based on instruments of ownership or voting securities, owning of record in excess of 50 percent of an entity; or (3) Having any other relationship which gives one person authority directly or indirectly to determine the manner in which an applicant, an operator, or other entity conducts surface coal mining operations."

30 C.F.R. § 773.5(a)(2).

debts. OSM informed Arch it can avoid becoming permit-blocked by paying the AML fees and penalties of Greendale.

Arch has attempted to persuade OSM no ownership and control link between Arch and Greendale should be made. To date, Arch's efforts have been unsuccessful. OSM has not issued a final decision whether Arch will be linked to Greendale on the AVS.

Arch filed its Complaint for Injunctive Relief and Declaratory Judgment on January 13, 1995, seeking a Temporary Restraining Order ("TRO") and continuing injunctive relief, pending the Court's consideration of Arch's challenge to what it believes to be an imminent decision from OSM to impose a nationwide mine permit-block on Arch. On January 19, 1995 the Court issued a TRO, to be effective until the Court had ruled on certain motions to be filed by the parties. The TRO was extended by an Agreed Order entered on January 30, 1995 and again extended by an Agreed Order entered on February 28, 1995. It remains in effect.

The parties agree there are no remaining issues of material fact and ask the Court to consider previously submitted memoranda as cross motions for summary judgment. Likewise, the parties rest on the memoranda submitted in support of and in opposition to Defendants' Motion to Dismiss and Plaintiff's Motion for a Preliminary Injunction. This opinion resolves the issues and the case.

### ISSUES AND RELIEF REQUESTED

Under *Rule 56(c)* of the *Federal Rules of Civil Procedure,* summary judgment is proper only:

> "If the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law."

Fed.R.Civ.P. 56(c).

The Defendants assert: 1) the Complaint should be dismissed because there is no case or controversy; 2) Count II of the Complaint requesting a declaratory judgment based on the statute of limitations at 28 U.S.C. § 2415 should be dismissed for failure to state a claim upon which relief can be granted; 3) Count III should be dismissed because Plaintiff has failed to exhaust its administrative remedies; and, 4) this action should be dismissed for lack of subject matter jurisdiction.

Plaintiff seeks a declaratory judgment that: 1) OSM's claim for payment of Greendale's delinquent civil penalty is barred by 28 U.S.C. § 2462; 2) OSM may not threaten to link or actually link Arch to Greendale under its ownership and control rule because Arch did not own or control Diamond Shamrock Coal when Greendale's debts were incurred; and 3) OSM's action represents an impermissible retroactive application of its ownership and control rule to Arch.[4]

Should the Court grant declaratory relief, the Plaintiff further seeks a Permanent Injunction prohibiting the Defendants and their officers, agents, employees, and attorneys from making a determination Arch is related to Greendale as an owner or controller, permit-blocking Arch, its subsidiaries or affiliates based on Greendale's delinquent AML fees and civil penalty, or taking any other action to collect Greendale's delinquent AML fees and civil penalty from Arch.

### I

### CASE OR CONTROVERSY

■ The complaint seeks a declaration that the Defendants may not threaten to link or actually link Arch to Greendale, and therefore may not block any permit actions by Arch, its subsidiaries, or affiliates. Federal courts may issue declaratory judgments only in cases of actual controversy. *Charter Fed. Sav. Bank v. Office of Thrift Supervision,* 976 F.2d 203, 208 (4th Cir.1992) (citing 28 U.S.C. § 2201 (1988)), *cert. denied,* —— U.S. ——, 113 S.Ct. 1643, 123 L.Ed.2d 265 (1993). Additionally, the case or controversy must be "ripe" for judicial review. In an

---

4. The Court was also asked to resolve the case based upon Delaware corporate law. Because the case can be resolved applying federal law without resort to Delaware law, the Court need not address this issue.

administrative case, this means there must be "an administrative decision [that] has been formalized and its effects felt in a concrete way by the challenging parties." *Id.* (citing *Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n,* 461 U.S. 190, 200, 103 S.Ct. 1713, 1720, 75 L.Ed.2d 752 (1983) and *Abbott Lab. v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515–16, 18 L.Ed.2d 681 (1967), *overruled on other grounds by Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977)). The basic rationale for the ripeness limitation on judicial review is to:

> "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties."

*Abbott,* 387 U.S. at 148, 87 S.Ct. at 1515.

■ *Abbott* established a pragmatic two part test for determining ripeness. First, the Court must determine whether the issues are fit for judicial decision. "A case is fit for judicial decision where the issues to be considered are purely legal ones and where the agency rule or action giving rise to the controversy is final and not dependent upon future uncertainties or intervening agency rulings." *Charter Federal,* 976 F.2d at 208 (citing *Abbott,* 387 U.S. at 149, 87 S.Ct. at 1515). Second, the Court must determine whether hardship will fall to the parties upon withholding court consideration. *Abbott,* 387 U.S. at 148, 87 S.Ct. at 1515. "The hardship prong is measured by the immediacy of the threat and the burden imposed on the petitioner who would be compelled to act under threat of enforcement of the challenged law." *Charter Federal,* 976 F.2d at 208–209.

> "Where the legal issue presented is fit for judicial resolution, and where a regulation requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance, access to the courts under the Administrative Procedure Act and the Declaratory Judgment Act must be permitted, absent a statutory bar or some

other unusual circumstances, neither of which appears here."

*Abbott* 387 U.S. at 153, 87 S.Ct. at 1518.

In *Charter Federal,* a financial institution initiated an action against the director of the Office of Thrift Supervision ("OTS") and the Federal Deposit Insurance Corporation ("FDIC") seeking a declaration as to the enforceability of a contract which permitted the institution to amortize "supervisory goodwill" resulting from a merger. 976 F.2d 203. The FDIC had not threatened action against the institution, but the lower court found the institution was under an "immediate threat of being placed into receivership under the FDIC." *Id.* at 207.

Our Court of Appeals held the district court lacked jurisdiction over the claim against the FDIC because the claims were not ripe for review. Finding the FDIC had two possible avenues of involvement with several contingencies separating the complainant from a threat of final agency action, the Court reasoned:

> "Although we realize that 'final agency action' in this context does not mean that all administrative procedures must have been satisfied, *see Frozen Food Express v. United States,* 351 U.S. 40, 44–45, 76 S.Ct. 569, 571–72, 100 L.Ed. 910 (1956), it does mean that a definitive decision or ruling must have been made with regard to petitioner. Here, the FDIC has not determined Charter to be in an "unsafe or unsound condition," not issued a first notice to correct operating practices, nor indicated any other action which would cause Charter to change its operating practices."

*Id.*

Similarly, the Court of Appeals determined it lacked subject matter jurisdiction in a dispute over an Environmental Protection Agency ("EPA") internal memorandum advising a permit was required for storm water discharges from construction activities involving oil and gas facilities. *Appalachian Energy Group v. Environmental Protection Agency,* 33 F.3d 319 (4th Cir.1994). The memorandum expressed an opinion sent in response to a question by the EPA coordinator. The Court found "[w]hile the memoran-

dum in this case may signal the position that the EPA might eventually take, the EPA has not taken any action at this point triggering our power to review its position. Certainly, in its December 10 memorandum, the EPA did not issue or deny any permits to petitioner *or threaten such action.*" *Id.* at 322 (emphasis added). Therefore, the "action" complained of was unripe for judicial review.

The Fourth Circuit examined another case involving a holder of a concession contract to provide transportation to and from Fort Sumter National Monument. *Fort Sumter Tours, Inc. v. Andrus,* 564 F.2d 1119 (4th Cir.1977). The holder, Fort Sumter Tours, brought an action against the Secretary of the Department of the Interior to prevent the award of the concession contract to another transportation company, Gray Line Water Tours, because the award allegedly was in derogation of the Plaintiff's statutory right of preference. The statute granted Fort Sumter preferential renewal rights because it had performed its obligations under prior contracts in a manner satisfactory to the Secretary.

The Secretary, through the National Park Service ("Park Service"), advised Fort Sumter of his intention to negotiate the new contract with it, conditioned on its agreeing to modify the proposal to meet certain items Gray Line had proposed which the Park Service felt were clearly superior. Fort Sumter was advised further its failure to accept the additional terms would operate as an automatic waiver of its preferential negotiating rights and would result in the Park Service entering into negotiations with Gray Line. Fort Sumter conditionally accepted the new terms but initiated the lawsuit. The Park Service viewed the conditional acceptance as a rejection and a waiver of preferential negotiating rights.

The issue before the Court was whether the Service's action constituted a "final agency action." The Court found:

"[n]o further administrative action as regards plaintiff is contemplated unless negotiations break down between Gray Line and Service. As between Fort Sumter and Service, the issues have become sufficiently crystallized to warrant judicial resolution. For all of these reasons, we find nothing to be gained by refraining from exercising jurisdiction at this time."

*Id.* at 1123. The Court recognized that "[w]hile it is generally true that judicial review awaits the issuance of a formal administrative order enforceable against a person or class of persons, such action is not an absolute prerequisite to judicial review." *Id.* If judicial review were to be postponed until a concession contract was executed, the "delay might prove costly to all concerned.... The better course is to resolve the dispute now by clarifying Fort Sumter's legal rights prior to the execution of the new contract." *Id.* at 1124.

■ In contrast to *Charter Federal* and *Appalachian Energy* but similar to *Fort Sumter,* OSM has not taken final action to inflict irreparable harm on Arch, but may do so without further notice at any moment. OSM informed Arch: (1) Greendale had an unpaid civil penalty and unpaid AML fees, and (2) because Arch was presumed to be an "owner/controller" of Greendale, Arch would be permit-blocked based on these outstanding debts unless Arch rebutted this presumption of control to OSM's satisfaction. (Letter from OSM to Steven F. Leer, President, Arch Mineral Corp. of May 21, 1993). OSM further stated Arch was being given "[a]n opportunity to provide [OSM] with information to rebut our presumption that [Arch] is an owner/controller of the violator," and warned, "if we do not receive a written response ... the Applicant/Violator System ("AVS") will generate a negative recommendation on [Arch's] pending permitting actions." *Id.*[5]

---

**5.** Following the submission of all relevant documents in Arch's possession and exchange of correspondence between Arch and OSM, OSM reiterated, "Arch is a presumed controller of Greendale." (Letter from OSM to Blair Gardner, Vice President of External Affairs, Arch Mineral Corp. of Sept. 30, 1994). OSM further stated:

"[Arch is] being given an additional thirty (30) days ... to submit further rebuttal evidence on Arch's behalf. If no response is received at the end of the thirty-day period, Arch *will be entered* in the Applicant/Violator System as an owner and controller of Greendale."
*Id.* (emphasis added).

Arch has no additional rebuttal evidence to provide. As a result, there can be little doubt OSM intends to enter Arch into the AVS as linked to Greendale, and therefore permit-blocked, in the immediate future. The Court is thus of the opinion the action giving rise to this controversy is final and not dependent upon future uncertainties or contingencies.

The Court finds the issues are crystallized sufficiently to warrant judicial resolution. Postponing judicial review until Arch is entered into the AVS definitely would prove costly to Arch. As in *Fort Sumter*, the better course is to resolve the issues now by clarifying Arch's rights prior to its being entered into the AVS.

Arch seeks a declaration that OSM's action is barred by the statutes of limitations at 28 U.S.C. §§ 2415(a) and 2462. This presents purely legal issues and there is no dispute as to any underlying material facts. The first prong of the *Abbott* test is satisfied.

Applying the second prong, the Court finds the threat with which Arch is faced is immediate. In the absence of relief from the Court, OSM may enter Arch at any moment into the AVS and permit-block all its prospective operations without further notice. The resulting harm to Arch would be immense.[6]

If Arch is linked to Greendale by the AVS, its operating subsidiaries will be blocked from obtaining new permits and from obtaining permit renewals and modifications required for Arch's existing operations. *See* 30 C.F.R. § 773.15(a). This would have an immediate and severe impact on Arch's continued ability to engage in its sole business, the production and sale of coal.

A permit-block would increase Arch's costs significantly in conducting its mining operations and would jeopardize Arch's ability to deliver coal to its customers on a consistent basis. Arch's mining and reclamation sequences would be disrupted; Arch might have to abandon coal or mine areas prematurely; and, Arch likely would be forced to modify or cancel plans for future developments, all of which could result in substantially increased operational costs. A restriction or curtailment of operations would affect the employment and earnings of many of Arch's more than seven hundred and seventy (770) employees in the State of West Virginia and its more than one thousand three hundred and sixty (1,360) employees in four other states.

Being placed on the nationwide permit-block would also impair Arch's business reputation significantly by exposing it to the public stigma associated with such a listing. Accordingly, the Court concludes both prongs of the *Abbott* ripeness test are satisfied and holds the statute of limitation issues are ripe for adjudication. Accordingly, the Court DENIES Defendants' motion to dismiss the Complaint. There is a ripe case or controversy.

## II

### STATUTE OF LIMITATIONS
### 28 U.S.C. § 2415

■ Generally, a sovereign is exempt from the operation of a statute of limitations. *Guaranty Trust Co. of N.Y. v. United States,* 304 U.S. 126, 132, 58 S.Ct. 785, 788, 82 L.Ed. 1224 (1938). Unless Congress explicitly provides otherwise, the government is not subject to any limitations period. *United States*

---

**6.** In a similar situation where OSM asserted an ownership and control link and threatened a permit block, the permittee company, Coteau, sought injunctive relief. *Coteau Properties Co. v. Department of Interior,* 53 F.3d 1466 (8th Cir. 1995); *see also infra* at —— n. 9. The Court discussed the irreparable harm Coteau would face in the absence of an injunction:

"Coteau is almost constantly in the process of renewal, revision or review of its permits. Delay, denial or suspension of these revisions would clearly cause Coteau serious difficulties in meeting its contractual obligations, if not make it impossible to meet them. Coteau has no power to cause Basin, or entities linked to Basin, to remedy a violation, should one occur. Thus, if Basin or its linkages commit a violation and refuse to remedy it, Coteau could lose its permits indefinitely. The consequences to Coteau of, through no fault of its own, breaching a contract will be irreparable once they have occurred, and a preliminary injunction will ensure that Coteau suffers no loss during the pendency of this case."
*Id.*

*v. City of Palm Beach Gardens,* 635 F.2d 337, 339 (5th Cir.1981), *cert. denied,* 454 U.S. 1081, 102 S.Ct. 635, 70 L.Ed.2d 615 (1981); *United States v. Weintraub,* 613 F.2d 612, 620 (6th Cir.1979), *cert. denied,* 447 U.S. 905, 100 S.Ct. 2987, 64 L.Ed.2d 854 (1980). SMCRA contains no limitation of action; therefore, it is necessary to look outside the Act for guidance.

■ Defendants argue Count II of Arch's Complaint should be dismissed for failure to state a claim upon which relief may be granted. Count II requests a declaratory judgment based upon the statute of limitations found in 28 U.S.C. § 2415.

> The statute provides, in pertinent part: "every action for money damages brought by the United States or an officer or agency thereof which is founded upon any contract express or implied in law or fact, shall be barred unless the complaint is filed within six years after the right of action accrues or within one year after final decisions have been rendered in applicable administrative proceedings required by contract or by law, whichever is later."

28 U.S.C. § 2415(a) (1984).

OSM is neither suing nor threatening to sue Arch for money damages. Rather, it is exercising its mandate, pursuant to Section 510(c) of SMCRA, 30 U.S.C. § 1260(c), to determine the fitness of applicants to receive new permits. The possibility that outstanding debt, which may be uncollectible in a civil action, can serve as the basis for a permit-block does not conflict with the purpose of the statute of limitations because the statute cuts off the remedy of collection only, without extinguishing the debt itself. *Gerrard v. United States Office of Educ.,* 656 F.Supp. 570, 573 (N.D.Cal.1987). The court in *Gerrard* explained:

> "Section 2415(a) in particular cuts off the remedy of a civil action on a debt brought by the government, but leaves open many other means of enforcing the government's right. The government can proceed by administrative offset; it can assert offset as a defense in a civil action brought by the debtor; and it can foreclose on a mortgage securing the debt."

*Id.* at 574.[7] Thus, the court concluded the phrase " 'legally enforceable' ... does not mean 'not barred by the statute of limitations.' " *Id.* "The Court should therefore give effect to the Congressional intent, manifested in the statutory language and legislative history, that § 2415(a) apply only to civil actions." *Id.* at 574.

The same conclusion was reached where the court noted debts otherwise time-barred under Section 2415(a) were nonetheless enforceable by law as counterclaims in litigation under Section 2415(f), by reports to credit bureaus, by foreclosure on security, and through administrative offset. *Roberts v. Bennett,* 709 F.Supp. 222, 225 (N.D.Ga.1989) (citing *Gerrard,* 656 F.Supp. 570). Section 2415(a) merely bars filing a complaint to enforce a debt owed the government after six years, the debt itself is not extinguished and other avenues are available for its enforcement. *Id.* at 224. The court noted "the language of § 2415 clearly imposes a limitation upon the use of judicial procedures to enforce a debt. It does not, however, limit administrative remedies available to the government." *Id.* at 225.

It is well-settled the running of a statute of limitations merely bars the assertion of a particular remedy outlined in the statute and does not extinguish the underlying claim. *Thomas v. Bennett,* 856 F.2d 1165 (8th Cir. 1988). In *Thomas,* the Court concluded the running of the statute of limitations set forth in 28 U.S.C. § 2415 did not prevent an obligation to repay a student loan from representing a "legally enforceable debt" subject to administrative offset. *Id.* at 1169. The Court reasoned:

> "[t]he limitation set forth in section 2415(a) does not terminate all of the government's rights on a contract claim after six years, but merely eliminates one potential remedy—the filing of a lawsuit seeking money damages. There are numerous avenues by which the underlying obligation embodied in the contract may be enforced after the

---

**7.** Both parties in the litigation agree the permit-block is not an administrative offset. *See* Plaintiff's Opposition Memorandum at 10 and Defendant's Reply Memorandum at 3.

six year period.... The statute of limitation can be differentiated from events which would extinguish the underlying obligation, such as discharge in bankruptcy, statutory discharge by reason of death or disability, or the successful assertion of defenses such as fraud in the inducement or failure of consideration."

*Id.*

The language of the statute itself supports the conclusion that the section does not apply to OSM's actions in this case. As the Court in *Gerrard, supra,* recognized:

"The use of the phrase 'action for money damages' indicates that the bar applies to judicial, not administrative, proceedings, as does the requirement that the government 'file a complaint' within six years. Moreover, this interpretation finds support in the legislative history. According to the Senate Report accompanying the act, the purpose of § 2415 is 'to provide a more balanced and fair treatment of litigants in civil actions involving the government.'"

*Gerrard,* 656 F.Supp. at 573 (citing S.Rep. No. 1328, 89th Cong., 2d Sess., *reprinted in* 1966 U.S.C.C.A.N. 2502, 2503).

These cases and SMCRA's legislative history show the statute of limitations at 28 U.S.C. § 2415(a) merely bars civil actions for the collection of a debt. It is apparent also from SMCRA's legislative history Congress saw the need to enact exceptions to Section 2415(a) in order to clarify that only one means of debt collection, the civil action, was to be time-barred. *See, e.g., Gerrard,* 656 F.Supp. at 573 (citing S.Rep. No. 378, 97th Cong., 2d Sess., *reprinted in* 1982 U.S.C.C.A.N. 3392–93 (Congress adopted the administrative offset exception at 28 U.S.C. § 2415(i) to correct a Justice Department determination the six year statute of limitations applied to administrative offsets)).

Furthermore, this action does not fall within the parameters of the statute because it is not founded upon a contract. Courts have considered and rejected the proposition that § 2415 applies to reclamation fee collection actions under the SMCRA. *See United States v. Tri–No Enter., Inc.,* 819 F.2d 154, 158 (7th Cir.1987) (Government's action to collect reclamation fees under SMCRA was

not an action on contract governed by § 2415(a). There was no evidence the company had entered into any agreement with the government to pay delinquent fees); *United States v. Ringley,* 750 F.Supp. 750, 758 (W.D.Va.1990) (payment of reclamation fees is not a contractual situation), *aff'd,* 985 F.2d 185 (4th Cir.1993); *United States v. E & C Coal Co.,* 647 F.Supp. 268, 273 (W.D.Va. 1986) (Section 2415 "does not impose a limitation period upon recovery of reclamation fees ... because the payment of such fees is not a contractual situation between the government and the defendant. Therefore, 28 U.S.C. § 2415 is inapplicable."), *aff'd in part & rev. on other grounds,* 846 F.2d 247 (4th Cir.1988).

Only one case found § 2415 applicable to reclamation fee collection actions under the SMCRA. *United States v. Gary Bridges Logging & Coal Co.,* 570 F.Supp. 531 (E.D.Tenn.1983). It, however, is distinguishable on its facts. In *Gary Bridges,* the government brought an action to collect abandoned mine reclamation fees. The debtor acknowledged owing the fees and executed an installment agreement to repay the debt to the government. The Court held the supervening installment contract between the government and the debtor made the statute of limitations applicable. Thus, the Court held the collection action attempted by the government was governed by 28 U.S.C. § 2415.

There is no contract between Plaintiff and Defendant in this case. The Court holds the permit-blocking mechanism under SMCRA is not time-barred under 28 U.S.C. § 2415. The Court **GRANTS** summary judgment to the Defendants on this ground and dismisses Count II of the Complaint.

### III

### STATUTE OF LIMITATIONS
### 28 U.S.C. § 2462

■ Plaintiff asserts the statute of limitations found at 28 U.S.C. § 2462 bars the Defendants' claim for payment of Greendale's delinquent civil penalty.

The statute, in pertinent part, provides:

"Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued."

28 U.S.C. § 2462 (1948).

In support of its argument, Plaintiff cites *3M Co. v. Browner,* 17 F.3d 1453 (D.C.Cir. 1994). The Court in *3M* held administrative proceedings by the Environmental Protection Agency to impose civil penalties for violations of the Toxic Substances Control Act fall within the statute of limitations at 28 U.S.C. § 2462. In so holding, the Court confirmed that limitation periods for federal enforcement and collection actions are applicable to administrative proceedings. As the Court noted:

"given the reason why we have statutes of limitations, there is no discernable rationale for applying § 2462 when the penalty action or proceeding is brought in a court, but not when it is brought in an administrative agency. The concern that after the passage of time 'evidence has been lost, memories have faded, and witnesses have disappeared' pertains equally to factfinding by a court and factfinding by an agency."

*3M,* 17 F.3d at 1456 (quoting *Order of R.R. Telegraphers v. Railway Express Agency,* 321 U.S. 342, 349, 64 S.Ct. 582, 586, 88 L.Ed. 788 (1944)).

In cases involving the SMCRA, where coal companies have sought to avoid payment of reclamation fees by arguing 28 U.S.C. § 2462 barred the action, courts have held § 2462 inapplicable. *United States v. Tri–No Enterprises, Inc.,* 819 F.2d 154 (7th Cir.1987); *United States v. Hawk Contracting, Inc.,* 649 F.Supp. 1 (W.D.Pa.1985). In both *Tri–No* and *Hawk,* the courts held the reclamation fee is not a "civil fine, penalty, or forfeiture" under § 2462, it "is simply an assessment or excise tax on all coal produced for sale by surface or underground mining.... [t]herefore, 28 U.S.C. § 2462 does not apply to an action to collect delinquent reclamation fees under SMCRA." *Tri–No,* 819 F.2d at 158; *accord Hawk,* 649 F.Supp. at 2.

In this action OSM is seeking fifty-eight thousand seventy-nine dollars and forty cents ($58,079.40) in AML fees as well as twenty-two thousand five hundred dollars ($22,500.00) in civil penalties. While the AML fees do not fall within the statute as a "civil fine, penalty, or forfeiture," the amount sought by OSM in civil penalties certainly does.

OSM's claims against Greendale and Diamond Shamrock Coal for payment of the civil penalty accrued on November 8, 1986, after Greendale failed to appeal either the violation or the penalty assessment. The five year statute of limitations found at 28 U.S.C. § 2462 applies to these claims. Because OSM failed to bring an action against either Greendale or Diamond Shamrock Coal within the required time, enforceability of these claims has lapsed.

The Court **GRANTS** Plaintiff partial summary judgment and holds 28 U.S.C. § 2462 bars the government's effort to collect the delinquent civil penalties.

## IV

### EXHAUSTION OF ADMINISTRATIVE REMEDIES

■ Defendants seek dismissal of this action because Arch has failed to exhaust administrative remedies under SMCRA. However, only administrative appeals mandated by statute or by agency rule need be pursued before seeking judicial review of an agency decision. *Darby v. Cisneros,* —— U.S. ——, 113 S.Ct. 2539, 2545, 125 L.Ed.2d 113 (1993); *Coteau Properties Co. v. Department of Interior,* 53 F.3d 1466 (8th Cir.1995) (Relying upon *Darby,* the Court held administrative review of enforcement actions arising under Section 521(a) of SMCRA, 30 U.S.C. § 1271(a), dealing with citizen complaints, is not specifically mandated by the Act; therefore, a party "need not exhaust optional administrative remedies before seeking judicial review.").

In *Darby,* a contractor was disqualified by a decision of the Secretary of Housing and Urban Development ("HUD") from participating in certain agency programs. —— U.S. ——, 113 S.Ct. 2539. Although authorized

by the agency's regulations to seek administrative review, the plaintiff instead filed suit under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, claiming the sanctions imposed by HUD violated the agency's own regulations and were "not in accordance with law" within the meaning of Section 706(2)(A) of the APA. *Id.*

The Court found neither the National Housing Act nor HUD regulations expressly mandated exhaustion of administrative remedies prior to seeking judicial review. *Id.* at ———, 113 S.Ct. at 2543. The Court held an agency action is "final" for the purpose of judicial review unless an administrative appeal is "expressly prescribed" by statute or when an agency rule requires an administrative appeal before judicial review and the agency action is made inoperative pending that review. *Id.* at ——–——, 113 S.Ct. at 2544–2548. Unless administrative review is explicitly required in one of these two ways, judicial review of agency action is available.

 Neither SMCRA nor OSM regulations *require* a party linked by a final agency decision to the ownership and control of another company to pursue an administrative appeal as a prerequisite to judicial review of the agency's decision. Recently promulgated rules effective November 28, 1994 now specify procedures for appealing ownership and control decisions. *See* 59 Fed.Reg. 54306 *et seq.* for OSM's regulations *and* 54 Fed.Reg. 54356 *et seq.* for OHA's regulations. However, these rules do not *require* an administrative appeal be pursued before seeking judi-

cial review. Further, they do not automatically suspend the agency decision pending administrative appeal.

Under these rules, a person who receives a written decision from OSM concerning an ownership and control link "*may file* a request for review with the [Office of Hearings and Appeals]." 43 C.F.R. § 4.1381 (emphasis added); *see also* 30 C.F.R. § 773.24(d)(2)(ii) (a person "may appeal" an OSM ownership and control decision to the Office of Hearings and Appeals in accordance with 43 C.F.R. §§ 4.1380—4.1387). Pending final resolution of the claim, a person "may petition" for temporary relief from the agency decision. *Id.*

Because neither SMCRA nor OSM regulations require exhaustion of administrative appeals prior to seeking judicial review of an agency decision, the Court holds Arch may seek judicial review of OSM's decision to link it to Greendale without pursuing the optional administrative remedies. Accordingly, the Court DENIES Defendants' motion for summary judgment on this ground.

**V**

### APPLICATION OF OWNERSHIP AND CONTROL RULE [8]

 Similar to *Coteau, supra,* Arch asks the Court to review OSM's application of the ownership and control rule and to declare the rule may not be applied in the manner OSM intends to apply it.[9] OSM seeks to hold Arch

---

**8.** Arch's claim does not constitute a challenge to OSM's ownership and control rule either directly or indirectly. Arch is not asking this Court to declare the ownership and control rule facially unconstitutional. Arch merely asks the Court to determine whether OSM's regulation *as applied to Arch,* under the unique circumstances in this case, is proper. The Court recognizes the appropriate jurisdiction for a national rule challenge lies with the District Court for the District of Columbia Circuit. 30 U.S.C. § 1276(a)(1). In fact, the ownership and control rule is currently the subject of a national rules challenge in the District Court for the District of Columbia. *National Wildlife Fed'n v. Babbitt,* Nos. 88–3117–AER, 88–3464–AER, 88–3464–AER (Consolidated).

**9.** In *Coteau,* with a much closer relationship between the parties, the Court found ownership

and control did *not* exist. *Coteau Properties Co. v. Department of Interior,* 53 F.3d 1466 (8th Cir. 1995). Coteau engaged in surface lignite coal mining and sales in North Dakota, selling approximately fifteen million tons of coal per year. Coteau maintained, through ownership and leasehold, coal reserves of approximately 50,500 acres. Five and seven tenths percent (5.7%) of the total tonnage of these reserves, private and federal, was leased or subleased from Basin. Under a separate coal requirement contract, Coteau sold coal to Dakota, a Basin subsidiary. The agreement required Coteau to fill Dakota's coal requirements; it did not require this coal come from any particular tract leased or owned by Coteau, nor did it significantly restrict Coteau's right to sell coal to any other buyer, as long as Dakota's requirements were met.

Prompted by a labor dispute, the United Mine Workers of America filed a "citizen's complaint"

responsible for payment of Greendale's debts through the assertion of an ownership and control link: 1) between Greendale and Diamond Shamrock under the contractor provision;[10] and, 2) between Diamond Shamrock and Arch based upon Arch's acquisition of Diamond Shamrock through a stock purchase agreement.

An OSM decision on ownership and control must be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Coteau*, 53 F.3d at 1475 (citing 5 U.S.C. § 706(2)(A)).

There are three ways in which a permittee can be related to a violation or delinquent penalty or fee: 1) directly responsible; 2) indirectly responsible; or, 3) linked to the violation, penalty or fee through ownership or control. 54 Fed.Reg. 18438, 18445 (April 28, 1989).

> "Direct responsibility arises where the permittee is cited on the violation notice or penalty assessment, or specifically is identified in a requirement to pay a fee.
>
> Indirect responsibility may arise through an ownership or control link under certain circumstances where the permittee *owns or controls* the person who is directly responsible. Indirect responsibility generally will not arise through an ownership or control link where the permittee *is owned or controlled by* the person responsible.
>
> A link through ownership or control arises where, under the violations review criteria of the applicable regulatory program, the permittee either owns or controls, or is owned or controlled by, the person directly responsible for a violation, penalty or fee."

*Id.* (emphasis in original).

The rule's purpose is to hold persons "[r]esponsible for any outstanding violations of the Act [including the nonpayment of civil penalties and AML fees] which such a person could have prevented or corrected." 53 Fed. Reg. 38868, 38877 (Oct. 3, 1988) (Preamble to ownership and control rule). When a person is either directly or indirectly responsible for a delinquent penalty or fee, "[h]e or she cannot avoid this responsibility by severing his or her link with any other person." 54 Fed.Reg. 18446 (April 28, 1989). However, when a person is linked only through ownership and control and has no direct or indirect responsibility for the violation, penalty, or fee, the person "may correct the defect in the permit and forestall the remedial measures of this rule by severing the ownership and control link." *Id.*

> "[W]here a permittee has no personal responsibility for a violation, penalty, or fee, and effectively severs his or her link with the person responsible, there no longer exists any reason to consider permit rescission or other remedial action.... At that point the slate is as clean as it should have been on the date the permit was issued, and it is not only reasonable, but also fully in compliance with [SMCRA] and its implementing regulations, to allow the permittee to retain the permit and continue to operate without interruption."

54 Fed.Reg. 18438, 18446–18447 (April 28, 1989).

OSM intends to link Arch to Greendale retroactively although the two companies had no dealings with each other during the period in question. OSM asserts Arch now should be linked to Greendale dating to a time before Arch acquired any interest in Diamond Shamrock. OSM contends such a link can be made under that portion of the ownership and control rule that was written to impose permit-blocks on persons who "are or have been in a position to have outstanding violations [including debts] corrected, and did not do so." 53 Fed.Reg. 38869 (Oct. 3, 1988).[11]

---

with OSM challenging one of Coteau's mining permits. The complaint alleged Basin owned or controlled Coteau and that Coteau failed to include this information in its permit application as required by state and federal regulations. Subsequently, OSM found Coteau was owned or controlled by Basin.

**10.** The contractor provision establishes a presumptive link where an entity "own[s] or con-

trol[s] coal to be mined by another person under a lease, sublease or other contract and [has] the right to receive such coal after mining." 30 C.F.R. § 773.5(b)(6).

**11.** Although not briefed by the parties, the Court recognizes successor liability may be imposed under certain situations.

The Court finds OSM's contentions are without merit. There is no evidence Arch had notice of Greendale's debts until the May 21, 1993 letter in which OSM notified Arch it had been identified as a "presumed owner or controller" of the former Greendale operations. Prior to this letter, Arch had not been billed or given any other notice of OSM's claims against Greendale or of OSM's intent to enforce such claims against Arch. All of the debts OSM seeks to recover from Arch were incurred long before Arch had any interest in Diamond Shamrock and long before Arch dissolved and distributed the assets of the corporation. Under OSM's own interpretation of its regulation, Arch cannot be permit-blocked through a link to Greendale's debts.

The Court finds OSM's application of the ownership and control rule to link Arch to Greendale must be set aside as arbitrary and capricious. Accordingly, the Court **GRANTS** summary judgment to the Plaintiff and holds OSM may not link Arch to Greendale under the ownership and control rule.

## VI

### SUBJECT MATTER JURISDICTION

■ Defendants assert this action should be dismissed for lack of subject matter juris-

> "Generally, the purchasing or transferee company is not liable on the other company's obligations merely by reason of its succession to such company's property. An express agreement, or one that can be implied, to assume the other company's debts and obligations, is necessary; or the circumstances must warrant a finding that there was a de facto consolidation or merger of the corporations, or that the transaction was fraudulent in fact, or that the purchasing company was a mere continuation of the selling company.... A fifth exception, sometimes incorporated as an element of one of the four listed above, is the absence of adequate consideration for the sale or transfer. If the corporation sells to another corporation its entire business operation and all of its assets, in exchange for some consideration other than stock, the two corporate entities remain distinct and each is liable for its own debts. The purchasing company is not liable for the debts of the seller where the conveyance was for an adequate consideration, notwithstanding the two companies had common directors and stockholders, especially where the seller retained property sufficient to pay its debts."

diction. Plaintiff's Complaint asserts the Court has jurisdiction based upon the Fifth Amendment to the United States Constitution, 28 U.S.C. § 1331 (federal question), 28 U.S.C. §§ 2201 and 2202 (declaratory judgment), and Rule 65 of the *Federal Rules of Civil Procedure* (injunctions). The Court has determined Arch's claim does not constitute a challenge to OSM's ownership and control rule either directly or indirectly. *See supra* at —— n. 8. As illustrated by the several rulings of this opinion, Plaintiff satisfies federal question jurisdiction. Accordingly, the Court **DENIES** the Defendants' motion for summary judgment on this ground.

## VII

### PUBLIC INTEREST

■ The Court notes it is in the public's interest that an injunction be issued. The communities in which Arch and its subsidiaries operate would suffer significant losses if Arch were placed on the AVS. The public has an interest in maintaining employment and tax revenues in these communities. Furthermore, this case has no connection to existing conditions at any site. Therefore, neither the public nor the environment will be affected adversely by the issuance of a permanent injunction.

15 William Meade Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 7122, at 231 (1990) (internal footnote citations omitted); *see, e.g., R.C. McEntire & Co. v. Eastern Foods, Inc.,* 702 F.2d 471 (4th Cir.), *cert. denied,* 464 U.S. 849, 104 S.Ct. 156, 78 L.Ed.2d 144 (1983); *In re State Public Bldg. Asbestos Litig.,* 193 W.Va. 119, 454 S.E.2d 413, *cert. denied,* —— U.S. ——, 115 S.Ct. 2614, 132 L.Ed.2d 857 (1995); *Davis v. Celotex Corp.,* 187 W.Va. 566, 420 S.E.2d 557 (1992); *Blizzard v. National R.R. Passenger Corp.,* 831 F.Supp. 544 (E.D.Va.1993); *Rafael v. Hurst Performance, Inc.,* 793 F.Supp. 116 (D.Md.1992); *Beals v. Washington Int'l, Inc.,* 386 A.2d 1156 (Del.Ch.1978).

The Government has not presented evidence or argument under general corporate law asserting successor liability in this case. Further, there is no factual foundation to establish Arch agreed explicitly, implicitly, or otherwise to pay or succeed to any reclamation liability and penalty incurred by Greendale's operations. The Court is not in a position to speculate on this matter.

Moreover, OSM's AML Fund currently has a balance in the hundreds of millions of dollars to be used in reclamation efforts.[12] The public will not suffer measurably by foregoing fruits of the collection methods attempted here.

## VIII

## CONCLUSION

Based upon the absence of any genuine issue of material fact and the law, the Court **GRANTS** summary judgment that: 1) the statute of limitation issues are ripe for adjudication; 2) 28 U.S.C. § 2415 does not bar OSM's claim for payment of Greendale's delinquent civil penalty; 3) 28 U.S.C. § 2462 bars OSM's claim for payment of Greendale's delinquent civil penalty; 4) Plaintiff need not exhaust its administrative remedies before resorting to judicial review; 5) this Court has subject matter jurisdiction to entertain this action; and, 6) OSM's application of the ownership and control rule to link Arch to Greendale must be set aside as arbitrary and capricious. The Court **GRANTS** Arch's motion for a permanent injunction prohibiting OSM from linking Arch to Greendale under the ownership and control rule.

Because final declaratory judgment will be entered in favor of Arch on the rulings made, there is no need for the Court to examine the other issues raised by the parties. The Court **ORDERS** this action dismissed from the docket of the Court.

---

**12.** Plaintiff contends, and Defendant does not dispute, the AML Fund currently has an unused balance of in excess of seven hundred fifty mil- lion dollars ($750,000,000.00). (Arch Mem. in Support of Motion for Preliminary Injunction at 12).